(No. 28271.—

ALBERT A. SPRAGUE *et al.,* Trustees of Chicago Rapid Transit Company, Appellants, *vs.* JOHN D. BIGGS *et al.,* Appellees.

*Opinion filed May 23, 1945—Rehearing denied September 13, 1945.*

HERBERT M. JOHNSON, and BELL, BOYD & MARSHALL, (THOMAS L. MARSHALL, and DAVID A. WATTS, of counsel,) all of Chicago, for appellants.

GEORGE F. BARRETT, Attorney General, (WILLIAM C. WINES, and STEPHEN M. FLEMING, both of Chicago, of counsel,) for appellees John D. Biggs *et al.*

BARNET HODES, Corporation Counsel, (JAMES J. DANAHER, and WILLIAM H. SEXTON, of counsel,) all of Chicago, for appellee City of Chicago.

RICHARD H. FIELD, DAVID F. CAVERS, HARRY R. BOOTH, ROBERT S. KEEBLER, and HERBERT SHARFMAN, all of Washington, D. C., (ALEX ELSON, of Chicago, of counsel,) for appellees Fred M. Vinson *et al.*

Mr. JUSTICE MURPHY delivered the opinion of the court:

This suit was started in the circuit court of Cook county to enjoin the members of the Illinois Commerce Commission and the Attorney General from enforcing certain orders entered by the commission, regulating fares to be charged and collected by the plaintiffs, who are the trustees of the Chicago Rapid Transit Company property. The cause comes direct to this court on constitutional questions from a decree which dismissed the complaint for want of equity.

The Chicago Rapid Transit Company, an Illinois corporation, was organized in 1924 and succeeded to the ownership of the property and assets of four pre-existing railway corporations. It was in effect a consolidation of the property of the four companies, namely: The Northwestern Elevated Railway Company, South Side Elevated Railway Company, Metropolitan West Side Elevated Railway Company, and Chicago and Oak Park Elevated Railway Company. In June, 1932, the Federal district court appointed a receiver for the transit company properties and from that time to January, 1937, it operated as a public utility under a receivership of the said Federal court. On January 27, 1937, proceedings were filed in Federal court under section 77B of an act of the United States relating to bankruptcy. A trustee was appointed pursuant to said act, and thereafter, on or about March 31, 1941, an additional trustee was appointed. Plaintiffs are acting in such capacity and will be referred to as trustees. During the receivership and later under the reorganization proceedings, the properties have been operated as a public utility subject to regulatory orders and measures imposed upon it by the Illinois Commerce Commission.

Various street railway companies operated surface streetcar systems in the city of Chicago, some of which were in localities serving the same area as the trustees' property.

These several lines will be referred to collectively as the "surface lines." A third carrier operating in the city of Chicago and covering parts of the same field as trustees' property was the Chicago Motor Coach Company. It will be referred to as the "motor coach." Since 1935 the transit lines, surface lines and motor coach have been operating subject to the commission's order which required the issuance of intercompany passenger transfers between the transit company, on the one hand, and the surface lines, or the motor coach, on the other. The orders of the commission provided for a division of the fares, and, since this action included intercompany fares, the surface lines and motor coach were made parties defendant. They are not opposing the trustees' claims in this action, their only interest being in the percentage they shall receive if and when there is an increase in the intercompany fares. The city of Chicago obtained leave to intervene, filed an answer and resisted the application of the trustees for an increase of fares. A separate brief has been filed in this court on behalf of the city. Some of the contentions made in such brief are common to those made in the brief filed on behalf of the commission and the Attorney General. Unless otherwise noted, the designation of parties as defendants shall be intended to include the commission, Attorney General and the city of Chicago. One of the suburbs of the city of Chicago located in the area served by a part of the elevated line intervened but has not appeared or filed a separate brief in this case. The Economic Stabilization Director of the Federal government also intervened and a separate brief has been filed in his behalf.

In July, 1941, the trustees filed a proposed increased schedule of rates with the commission, which will be referred to as schedule No. 5. Schedule No. 5 referred solely to intracompany fares. The same day that schedule No. 5 was filed, the trustees filed a petition with the commission asking for an increase of intercompany fares.

542

Schedule No. 5 was docketed under commissioners' cause No. 29923, which was a new number. The petition for an increase of intercompany fares was docketed under commission docket No. 22981, which was a number of a cause that had been pending for some time and there was involved and still pending under said number the final determination of the division of the intercompany fares between the transit company, surface lines and motor coach. Both matters were set for hearing and, after some evidence had been taken on the intracompany fare petition in No. 29923, the trustees, on November 5, 1941, filed two additional petitions, one under No. 29923, pertaining to intracompany fares and the other under No. 22981, pertaining to intercompany fares. Each petition contained allegations to the effect that the financial condition of the trust estate was such as to need an increase of fares, and in No. 29923 the prayer was that schedule No. 5 be put into immediate effect without the thirty-day statutory notice. The petition in No. 22981 asked for immediate increase of intercompany fares. Further evidence was heard in No. 22923 and during the course of the proceedings the parties stipulated that the evidence taken in such cause should be considered as evidence in No. 22981. On February 13, 1942, orders were entered in each of said causes denying the petitions for temporary increase of fares. On February 20, thereafter, this action was instituted based on the two orders of February 13 denying temporary increase. The taking of evidence was concluded in No. 22923, and on June 15, 1942, an order was entered permanently denying or suspending schedule No. 5. Thereafter the trustees filed the amended and supplemental complaint on which the cause was tried and in which they set forth the matters which occurred subsequent to the filing of the original complaint on February 20.

The gist of the trustees' action was that the two orders of February 13, denying a temporary increase of fares,

and the order of June 15 permanently suspending schedule No. 5, deprived plaintiffs of their property without due process of law and was in violation of the State and Federal constitutions. After the pleadings were at issue, the cause was referred to a special master who found in favor of the plaintiffs and recommended a permanent injunction issue enjoining the enforcement of the orders above referred to. Exceptions were sustained to the special master's report and a decree entered dismissing the complaint for want of equity. This appeal followed.

Defendants advance various contentions which are preliminary to the main issues and which would, if sustained, furnish a basis for disposal of the case without a consideration of the real issue presented by the trustees. These several contentions will be given consideration first.

Defendants concede that under the authority of *Peoples Gas Light and Coke Co.* v. *Slattery,* 373 Ill. 31, a public utility has, under certain circumstances, the right to apply to a court of equity for relief against the orders of the commission, but defendants contend this action is not of that character. Defendants contend that plaintiffs did not exhaust their administrative remedies before the commission as to the intercompany fares and that equity will not take jurisdiction even in a confiscation case until the utility has exhausted the remedies provided for under the Public Utilities Act.

It will be noted, from the statement as to the procedure had before the commission, that when the amended complaint was filed the commission had not entered a final order on the trustees' petition asking for an increase of intercompany fares. It is stated in the briefs that a large amount of evidence had been taken in such action but that it had not been concluded. Such proceeding involved matters in which the surface lines and the motor coach were interested. The question then is as to whether it was essential to the maintenance of this action that the matter

of an increase of intercompany fares be first finally determined. The issue submitted for consideration by the amended and supplemental complaint is as to whether the facts pleaded, if proved, would show that the two orders of February 13, denying temporary increase of fares (intracompany and intercompany,) and the order of June 15, denying the increase proposed in schedule No. 5, had the effect of compelling the trustees to continue operation under a schedule of fares that were confiscatory as to the trust property without due process, in violation of the State constitution and the fourteenth amendment of the Federal constitution. The trustees' application for temporary increase of intracompany fares was accompanied by the specific request that schedule No. 5 be placed in effect at once. The fact that schedule No. 5 was the basis of the proposed increase in the original application would not prevent it from being the basis for a temporary increase. The two applications, that is the one for temporary increase of intracompany fares, and the one for an increase which was of a more permanent character, were separate and distinct matters, and although the evidence introduced in such proceedings was to a certain degree the same, they were, as to purpose and duration, of a different character.

In *Peoples Gas Light and Coke Co.* v. *Slattery,* 373 Ill. 31, this court recognized that the denial of a request for temporary increase of a fare might result in the violation of constitutional rights of the utility which would furnish a basis for a court of equity to take jurisdiction. In that case it was said: "The action of the commission which immediately preceded the filing of the equity suit in this case was its denial to install a temporary rate. Its order in this respect ended its legislative function so far as temporary rates were concerned. Without temporary rates the company would have to operate many months without an adequate return and with no possibility of getting any compensation if it were eventually successful." The order

of February 13 denying the temporary increase of inter-company fares was also a final determination of a legislative function.

The pleading of these two orders, accompanied with other facts, furnished a basis upon which a court of equity would take jurisdiction. It is not necessary at this juncture to determine whether the pleading of the order of June 15, 1942, which denied an increase of intracompany fares, and the failure to plead a final order as to inter-company fares, prevented a court of equity from taking jurisdiction. As pointed out, the orders denying temporary increase as to both intracompany and intercompany fares furnished a basis for equitable jurisdiction, and questions pertaining to the failure to have a final order on the trustees' application for an increase of intercompany fares will be reserved for later consideration.

Defendants earnestly contend that the allegation of the amended and supplemental complaint shows this to be an action to determine whether the evidence before the commission was sufficient to sustain the orders entered by it. In support of such contention reference is made to certain allegations of the amended complaint. It was alleged that after evidence showing the value of the trust property, cost of operation, revenues produced, and the incurring of certain unanticipated expenses had been introduced before the commission, the commission "nevertheless in arbitrary disregard of such evidence and the facts above set forth and the provisions of said Utility act, that the rates of fare shall at all times be just and reasonable, the commission entered orders as of February 13, 1942, denying plaintiffs' petition," etc. And, in another paragraph, it was alleged that "The action of the commission in entering such orders was arbitrary and capricious, contrary to law, and in total disregard of the evidence."

Defendants emphasize the presence of the words "arbitrary and capricious," "contrary to law" and "in total dis-

regard of the evidence" as submitting a question as to whether the evidence before the commission supports the findings set forth in the order. The record in this case shows that evidently many of the matters covered by the evidence on the hearing before the commission were introduced as evidence in this case, but it does not appear that all the evidence taken before the commission was made a matter of evidence in this case. If the amended complaint be given the construction contended for, then this cause resolves into an attempt to have a court of equity exercise appellate jurisdiction over orders and decisions of the commission. The right of appeal from the commission is provided for by section 68. (Ill. Rev. Stat. 1943, chap 111⅔, par. 72.) As pointed out in the *Slattery case,* situations may arise in rate cases before the commission where the procedure to be followed under the Public Utilities Act does not furnish a utility full and adequate means to prevent the actions of the commission in reference to rates from violating constitutional rights. Under such circumstances, a court of equity takes jurisdiction to prevent the utility suffering irreparable loss and injury. The equity action is a trial *de novo* and is independent of the proceeding pending before the commission. There may be questions of fact which are common to both cases and the decisions to be made may relate to the same subject matter, but on the issues raised and the matter of proof to be followed in the equity case they are to be considered as separate and distinct actions. The opinions in some of the cases indicate that the evidence introduced before the commission was placed in evidence in the equity suit, but it cannot be said that such procedure is essential in all cases to the maintenance of the equity action.

We believe the principles announced in *Pendergast* v. *New York Telephone Co.* 263 U. S. 43, 67 L. ed. 853, are applicable to this question. It was an action in equity to enjoin the enforcement of two orders of the Public Ser-

vice Commission and the State of New York, which had temporarily reduced, pending final determination, certain rates to be charged by the company. It was contended that the evidence before the commission should have been introduced into the equity action. After stating that the pleadings did not raise a question as to the arbitrary action of the commission, it was said: "The sole issue presented was whether or not the orders were confiscatory; which was to be determined by the court upon the evidence submitted to it. Either party might, of course, show, by competent testimony, any fact brought out before the commission which might throw light upon this issue; and the defendants cannot now rightly complain that the complainant did not introduce evidence which they themselves do not appear to have regarded as material."

Counsel for defendants cite many cases, some from Federal jurisdictions, in support of their contention that the failure to introduce the evidence before the commission is fatal to this proceeding. An examination of those cases discloses that the issues to be determined in many of them were not the same as the issue in this case. For illustration, in *Spiller* v. *Atchison, Topeka and Santa Fe Co.* 253 U. S. 117, 64 L. ed. 810, the action was to recover reparations which had been allowed for excessive charges. The question of confiscation was not involved. The issue in *Hudson & M. R. Co.* v. *Harding,* 103 Fed. 2d 327, was as to whether the complaint was subject to the provisions of the Railway Labor Act. The case of *Louisiana Pine Bluff Railway Co.* v. *United States,* 257 U. S. 114, 66 L. ed. 156, was submitted on a stipulation of facts, which was a controlling factor in the decision.

The allegations, which constitute the general gist of the complaint, that the commission acted "arbitrary," "capricious" and in "disregard of the evidence" are mere conclusions of the pleader and there was no allegation of fact to support them. We conclude that the allegations of the

complaint, when considered together, stated a cause of action, the gravamen of which was that the enforcement of the orders of the commission would result in confiscation of trustees' property.

The city of Chicago does not join the other defendants in the following contention. The facts pertinent to it are that, prior to organization of the Rapid Transit Company, each of the four elevated companies had a franchise with the city of Chicago. The commission's orders of February 13, 1942, contained a general finding that the several franchises contain provisions regulating the fare which was a basic cash fare, a minimum of five cents with no through-service fare to the city of Chicago in excess of ten cents. It was stated that the franchise for the Oak Park-Lake Street Branch expired prior to 1941, that principal portions of the franchise of the Metropolitan West Side Branch expired in April, 1942, and that the remaining franchises expired at various dates beginning in 1944.

The contention is made that the expiration of a part of the franchises and the early termination of others leaves plaintiff without a standing in this case. It is argued that as to the franchises which have expired the trustees are, as to the property located in the streets under such franchises, "tenants at sufferance." It is intimated that as to such streets the trustees are trespassers. Assuming that the expiration of the leases creates such a relationship, it is argued that the trustees cannot invoke the "constitutional right to make a fair rate of return or even to avoid a loss." We will treat such contention as predicated on the theory that a utility which has no franchise giving it the right to continue to use the streets is not a going concern holding property which may be valued for rate-making purposes, rather than on the theory that equity will not aid a trespasser or wrong-doer.

As indicated, the franchises had not all expired, but for purposes here it will be assumed that all had terminated

by their terms. Defendants do not state whose "tenants at sufferance" the trustees might be, but since they refer to the expiration of the franchises granted by the city they must have intended that the term apply to the relationship that existed between the utility and the city. The character of the relationship between the city and the trustees was not made an issue by the pleadings, the special master's findings or exceptions thereto. The city's answer to the trustees' amended complaint makes no reference to the fact that the utility's franchises have expired. A separate brief has been filed in this court on behalf of the city and it contains no reference to the relationship existing between the city and the utility as to the property that stands in the streets.

The foregoing observations answer one phase of the question, but it should be given consideration from a broader aspect. The power to regulate rates of a public utility is fixed in the General Assembly and when exercised it is as an act of sovereignty performed in the interest of protecting the lives, health, comfort and general welfare of the public. Such power has been delegated to the Illinois Commerce Commission, and when the orders that are challenged in this case were entered the commission was exercising a part of the police power of the State. It was in the interest of the people of the State.

The power which the General Assembly confers upon a city to grant franchises to a utility for the use of the streets must be distinguished from the power which the General Assembly may delegate to be exercised in the regulation of rates of such utility. It has been held that where a city undertook to fix rates of a public utility operating within its boundaries, such action must give way to a rate fixed by the commission. (*Public Utility Com. ex rel. Quincy Railway Co.* v. *City of Quincy*, 290 Ill. 360.) In this case it was said: "The municipal authorities in this

State have never been clothed with power to fix, by binding contract, rates for any definite term of years."

In *Chicago Railways Co.* v. *City of Chicago,* 292 Ill. 190, in discussing a question somewhat similar to the one presented here, it was said: "A municipality is a mere agency of the State, and, whether invested with the fee or a mere easement in streets, it holds them in trust for the people of the whole State, and, so far as their use for street purposes is concerned, every citizen of the State has an equal right, and is represented not alone by the city of Chicago but by the General Assembly. * * * The General Assembly has the power and is charged with the duty to see that rates of fare in the use of streets are reasonable, within the limit, on the one hand, of a fair return to the railway company and reasonable compensation for the service rendered, and the interest of the city cannot affect the exercise of that power and duty."

The proceedings before the commission in this suit are on the assumption that the property held by the trustees is going to continue to render service as a utility, and that the city will continue to permit the use of parts of its streets. The orders of the commission are on the basis that the utility will continue to furnish transportation to the public. Under such circumstances, the property of the utility must be considered as devoted to a public utility and during the continuance of such use the trustees have the right to be compensated for the services it renders. We perceive no reason why the trustees operating a public utility under the circumstances shown would not be entitled to invoke the constitutional requirements of due process.

As an alternative to this contention it is urged that even if the expiration of the franchise does not peremptorily disentitle plaintiffs from claiming confiscation, such expiration would render the transit company's property which is located in the streets valueless except for scrap.

This contention is directed to the valuation to be placed upon property as a basis for rate-making purposes. This contention is answered by what was said in *Denver* v. *Denver Union Water Co.* 246 U. S. 178, 62 L. ed. 649. In that case a utility applied to a court of equity to restrain the enforcement of certain city ordinances which fixed the rates the utility might charge. It was alleged that the ordinances confiscated the utility's property and deprived it of due process of law within the meaning of the fourteenth amendment to the Federal constitution. The franchise which gave the utility permission to use the streets had expired before the ordinance in question was adopted. It was asserted that by reason of the expiration of the franchise the property in the streets had nothing but a "junk" value. It was said: "In this situation there can be no question of the company's right to adequate compensation for the use of its property employed, and necessarily employed, in the public service; nor can it be doubted that the property must be valued as property in use. It involves a practical contradiction of terms to say that property useful and actually used in a public service is not to be estimated as having the value of property in use, but is to be reckoned with on the basis of its 'junk value.' Nor is the question of value for present purposes greatly affected, if at all, by the fact that there is neither right nor obligation to continue the use perpetually or for any long period that may be defined in advance. The reason is not obscure: The cost and detriment to a property owner attributable to the use of his property by the public, and the value of the service rendered by the property to the public, are measured day by day, month by month, year by year, and are little influenced by the question how long the service is to continue. The cost of the service includes the use of the plant, but, ordinarily, not its destruction, except through the slow processes of wear and tear and obsolescence, for which graduated depreciation allow-

·ances are made. The whole calculation is a matter of income, not capital, accounting; and the cost and value of the use of a given property for a stated period is the same whether the use is to be continued after the expiration of the period or not. If the period is extended, compensation for the use is extended proportionately."

In *Iowa City* v. *Iowa City Light & Power Co.* 90 Fed. 2d 679, in a somewhat analogous case, it was said: "It is well settled that a public service utility operating under a city franchise is not released from its duty to render service at the moment its franchise runs out. Where the city inhabitants have become dependent upon the service and no other arrangements have been made to supply it, the obligation to serve remains on the utility whose properties still occupy the streets and public places. Neither is the city absolved from its duties by the termination of the franchise. The reciprocal duties which result from necessity when the term of the franchise expires are no less certain because the conditions are of indefinite duration. While they continue, the utility must keep the service up, and the city must require the rates to be reasonable. It follows that the utility must continue to use its best effort to render its service efficiently and economically, and a reasonable choice of means remains with the company. If in order to accomplish that end it is necessary for it to lay more pipe in streets in which it has not yet laid them, the temporary nature of its tenure in nowise relieves it of its duty, nor deprives it of its right, to keep up with the requirements of its service." See annotation on this question, 112 A. L. R. page 625. 43 Am. Jur. page 622, section 79.

We come to a consideration of the case on its merits. The trustees contend that the commission's denial of their petitions for temporary increases of intracompany and intercompany fares and the permanent suspension of schedule 5 leaves in force schedules which reduce the income

from property devoted to public use below the costs of operation. They also contend that they are entitled to an increase of fares sufficient to earn a fair return on the trust property devoted to the public use. The schedules remaining in force after the commission had denied the temporary increase and permanently suspended schedule 5, were substantially the same as had been charged on behalf of the transit system since prior to January 1, 1937.

In reply to the trustees' claim that they are operating at a loss, defendants answer by asserting that a net operating loss "can be ascertained only after subtracting from gross income such deductions as are not properly chargeable to reinvestment of capital, and, in the case of figures such as those representing depreciation, after a correct basis for depreciation has been established and after deferred maintenance has been eliminated." Defendants argue that any increase in fares to a public utility must meet the primary test of the value of the service rendered and that by such measure the service furnished the public by the trustees will not justify an increase of fares. They assert that "under no circumstances is a utility entitled to charge more than its service is really worth and this is true even though the result is loss or even ruin." Defendants make other contentions in reply to the trustees' claim that they are entitled to an increase of fares sufficient to earn a fair return on the trust property but such contentions will be reserved for later consideration. We will now consider the question as to whether the trustees have proved that the income from used and useful property is not sufficient to meet operating expenses.

The commission found that the increase as proposed by schedule 5 would increase the intracompany fares approximately 23 per cent. The basic cash fare in Chicago was proposed to be increased from ten cents to twelve cents. Certain classes of fares were discontinued but all that were retained were increased. The petition for temporary in-

crease of intercompany fares was upon substantially the same basis as the increase proposed by schedule 5 as to intracompany fares. The petition asked that the basic intercompany cash fare in the city of Chicago be increased from ten cents to 12 cents. The percentage of increase for this class of fares as found by the commission was approximately 20 per cent. The evidence of the trustees shows that if the increases were granted, it would increase their revenue approximately 14 per cent, or slightly more than $1,700,000 per year. From the adoption of the intercompany transfers, the basic ten-cent cash fare in the city of Chicago had been apportioned by order of the commission, so that the trustees, on the one hand, received six cents and the surface line or motor coach, as the case might be, received the remaining four cents.

The trustees operate and control approximately 82 miles of railroad line, all of which is available for local passenger transportation in the city of Chicago and ten suburbs, all located in Cook county. A considerable part of the system's mileage was owned by the transit company but a part was operated by the company under a leasing arrangement with the owners. It was all operated as one system, and the receiver, and now the trustees, have continued the leasing arrangements as to a part and continue to operate it as one system. A small part of the track is constructed at grade, some on an earthen embankment, but the greater part is on an elevated steel structure. A considerable portion of it is double tracks with certain places having three and four main tracks. The entire system is operated with electrical energy. It owns 1633 passenger cars and operates approximately 5300 trains every 24 hours. The greatest movement of trains is through the main business or loop area of the city of Chicago where at rush hours there are about 160 trains per hour. There are 227 passenger stations located approximately one third of a mile apart,

except in the loop district, where they are much closer. It employs regularly about 4650 employees.

The contention made upon this branch of the case presents questions relating to the trends for the various years from 1937 to the conclusion of the evidence taken before the special master, for the number of passengers carried, the passenger revenue received, the operating expenses and the effect of the war effort upon the several items. In this connection, it should be noted that this suit was started February 20, 1942, and was referred to a special master the following March. A large amount of evidence was taken, which covers 1000 pages of abstract and over 80 exhibits. The evidence brings the condition of operation down to May 31, 1943. Therefore, in making a statement of the facts in reference to such matters, it will be necessary to cover the period from January 1, 1937, to May 31, 1943. The evidence introduced on behalf of the trustee, as taken from their records and reports, shows that for each of the years 1937-1941 operating expenses exceeded the income in sums ranging from a low in 1941 of $559,878.40, to a maximum in 1939 of $981,879.70.

The evidence introduced on behalf of the trustees shows that passengers carried, passenger revenue received and revenue from other sources for each year were as follows:

|      | Passengers carried | Passenger revenue received | Income other than fares but from property devoted to public use | Total |
|------|------|------|------|------|
| 1937 | 150,349,614 | $12,342,578.40 | $1,284,735.23 | $13,627,313.63 |
| 1938 | 144,559,431 | 11,820,510.25 | 1,163,482.27 | 12,983,992.52 |
| 1939 | 145,394,382 | 11,902,248.21 | 1,097,399.63 | 12,999,647.84 |
| 1940 | 149,205,137 | 12,176,628.50 | 1,014,369.99 | 13,190,998.49 |
| 1941 | 153,895,490 | 12,596,373.32 | 1,020,834.58 | 13,617,207.90 |

The items which are included to make the totals are not questioned.

The items included as operating expenses and the percentage that each bears to the total cost of operation are as follows: (The percentage that the various items bear to the total varies, and therefore the percentages given are of a general average.) Labor 57 per cent, material 7½ per cent, power purchased 14¾ per cent, miscellaneous 7½ per cent, rent of tracks and facilities 5.85 per cent, taxes 9 per cent, depreciation 4.8 per cent, trustees interest .07 per cent. The total operating expenses for the several items for the respective years were as follows:

|      | Total operating expenses | Net operating loss |
|------|--------------------------|--------------------|
| 1937 | $14,403,815.27           | $676,615.13        |
| 1938 | 13,970,259.66            | 869,709.09         |
| 1939 | 14,082,261.50            | 981,879.70         |
| 1940 | 13,997,824.77            | 666,057.42         |
| 1941 | 14,357,184.76            | 559,878.45         |

The trustees control certain income properties which are not used or useful as a public utility. In reaching the foregoing balances of net operating losses the trustees included the income from the nonoperating property as a part of the gross income. The amounts received varied from $99,886.51 in 1937 to a high in 1941 of $180,098.41. If such income from nonoperating property were eliminated from the gross income the result would be that the balances of net operating losses as shown above would be increased in an amount equal to the nonoperating income that is deducted from the gross income.

The trustees contend that factors entered into the balance of 1942 that were not present in the balances for the preceding years. Such matters are as follows: The trustees entered into a contract with the collective bargaining agent of its employees, effective June 1, 1941, which increased the wages to be paid for the year in the sum of $806,998.96. Such contract was for one year and upon its expiration on May 31, 1942, the trustees refused to

contract for a further increase but upon reference to the National War Labor Board, an increase was approved, effective as of June 1, 1942. The latter increase added approximately $927,000 more, thus making a wage increase from June 1, 1941, of approximately $1,700,000 per year. It is further contended that increased prices of commodities and materials had materially affected operating costs and that the trend would indicate that such costs would continue to increase. It was also urged that the net annual operating losses had prevented the trustees from obtaining credit to carry out the orders of the commission of April, 1937, which were: (1) to install a full automatic block signal system; (2) to replace all wood, and wood and steel reinforced or composite cars with all-steel or metal cars within a period of approximately five years; (3) to repair, paint, rehabilitate and improve the steel and wrought-iron structures upon which cars and trains were operated, same to be completed within a period of five years, and (4) equip the motorman's cab front windows of all motor and control trailer cars with window wipers.

In 1942 passenger revenue was $13,835,646.92, which was an increase over passenger revenue received in 1940 of $1,659,018.42, and of $1,239,273.60 over 1941. The evidence shows that passenger revenue received for the first six months of 1943 was $7,649,137.20, which was an increase of $1,287,283.47 over the receipts for the corresponding six months of 1942. Income from property devoted to public use exclusive of passenger revenue for 1942 was $1,271,990.01, which was an increase over the 1940-1941 receipts, respectively, in excess of $250,000. The total income from used and useful operating property for 1942 was $15,007,636.94.

In 1942, the operating expenses were $13,222,343.50. Taxes assignable to operating property were $1,311,774.20, and rental of leased lines, miscellaneous rents and interest

on trustee obligations totals $662,744.55. The total of the said items was $15,196,862.28, thus exceeding the gross income from used and useful operating property in the sum of $189,225.34. A report introduced as an exhibit on behalf of the trustees shows that they included income from nonoperating property for the year 1942 in the sum of $232,146.25, thus converting the loss of $189,225.34 to a gain of $42,920.91. It does not appear that the trustees included anything for depreciation in the total listed as operating expenses for the year 1942. The trends of operating expenses for the first six months of 1943 are comparable with the like period for 1942.

Defendants' briefs contain general charges that the trustees evidence showing an operating loss is not founded on a proper basis. One statement is that deductions were made for operating expenses which should have been charged to reinvestment of capital. The items claimed to have been wrongfully classified are not pointed out by counsel, and, assuming that the reference was to materials and supplies purchased, it will be observed that the total materials included in the reports in 1937-1941 was about 7½ per cent of the total operating expenses. A similar general charge is made against the item of depreciation. As previously stated, the figures submitted for 1942 did not include any amount for depreciation. The totals shown for the years 1937-1941 did include depreciation, but even though the item of depreciation was rejected, the evidence shows that the operating expenses exceeded the gross income.

The orders of the commission denying temporary increases in intracompany and intercompany fares contained vague indefinite findings as to some of the items included by the trustees as operating expenses. In one instance, it is stated that the trustees have included an item of $93,000 as an expense which was rental for a leased line. The charge is accompanied with a statement that the trustee rejected a renewal of such lease but that the right of the

trustee to take such action was in litigation. There is nothing in the evidence in this case in reference to said matter except the statement contained in the order of the commission. In another instance, reference is made to the deduction for taxes. This is accompanied by an expression of doubt as to whether it should be rejected in its entirety because it contained improper items. The special master found that the net losses per year from 1938-1941 were in the amounts stated in the schedule of operating losses heretofore set forth. As to the year 1942, the special master found that there was a net gain of $42,920.91, and for the six-months' period of 1943 there was a gain of $219,831. From the figures stated for 1942, it is obvious that the master included the income from nonoperating property to arrive at such result. The 1943 figures appearing in the evidence do not reflect all the operating charges for that period.

From the evidence submitted we find that for 1941 the trustees operated at a loss and that the upward trend of increased revenues for 1942 and the first six months of 1943 were offset by the upward trend of wages, commodities and supplies. The conclusions in reference to the annual losses are drawn without making an allowance for depreciation.

Next for consideration is defendants' alternative contention that existing schedules of fares permit the trustees to charge all that the "traffic will bear," and, that being true, the trustees are not entitled to an increase "even though the result is loss or even ruin." In support of such contention, defendants refer to the evidence pertaining to the number of passengers carried by the transit company in years in which there was an increase in the rates. For a number of years, the basic cash fare was five cents. In 1918, it was changed to six cents, and at various times to 1928 this and other fares were advanced. The number of passengers carried in 1918 was 197,444,107, which was

a trend upward from 1916. Beginning with 1919, the trend was downward, until 1921, it was 180,629,282. The defendants attribute the decline following the 1918 adoption of a six-cent fare to the fact that an increase of fares caused customers to adopt other means of transportation such as the automobile and surface lines. Further figures fail to support the theory, for beginning with 1922, when the basic fare was at a higher level, the trend was upward, reaching a peak in 1926, when the number of passenger fares was 228,812,766. Following 1926, the trend was downward until 1933, when the number was 124,855,354. The trend of revenue followed the same course as the trend of the number of passengers carried. In the peak year of 1926, the total revenue was $18,891,998.03, and the low was in 1933, when $11,881,474.20 was received. The trend of number of passengers carried and revenue received, beginning with 1937, to May 31, 1943, is shown by the foregoing charts.

The figures indicating the trend on the number of passengers carried do not fully support defendants' evidence. The fluctuations over a period of years are as easily traceable to economic and other conditions as to increases of fares. The peak of the number of passengers carried was reached in 1926, which was after certain rates had been increased. This peak was during the business boom of the 20's. The low point on number of passengers carried was reached during a depression era, and, when business activities increased, brought on by war conditions, the trend was upward. Undoubtedly, the restricted use of private automobiles during the present world war has contributed to the increase of the number of passengers. It is obvious that increased rates have not been the sole factor which contributed to the fluctuations from year to year.

Defendants refer to the orders of the commission, finding that the operating equipment was antiquated and incapable of the service to which the public was entitled. It

is conceded on behalf of the trustees that there should be installed a complete block signal system, that a large majority of the present coaches should be replaced with steel coaches, that the elevated structure needs repair and paint to protect it against deterioration, but it is argued that the existence of such conditions has not prevented the furnishing of efficient and safe service. There is no evidence that tends to show that the public service demands the operation of the trains on a faster schedule or the installation of more trains. There is no evidence to show that the trains have not been operated with reasonable care or that travel on the system is not reasonably safe. In fact, the evidence shows, considering the number of trains each day and the schedules maintained, the accident rate is very low.

This is not a case where the necessity of a public service has, by reason of changed conditions, ceased to exist. The need of the public for a means of transportation is present as evidenced by the number of passengers carried by the elevated lines each year. There is no evidence which tends to show that there is another agency standing by capable of carrying the volume of passengers which the elevated lines have accommodated. We have not overlooked the findings of the commission as contained in various orders, that the present financial plight of the transit company is caused in part by the failure of the management in the past to create and maintain proper reserves for replacements and repairs, that there has been improper payment of dividends with money that should have been used to pay taxes, and other mismanaged financial affairs. They are not material to the inquiry as to whether the operating expense exceeds the operating income. Whatever effect such matters might have upon the fixing of a rate base need not be determined, for that is outside the scope of the present issue.

In *Norfolk & Western Railway Co.* v. *Conley*, 236 U. S. 603, 59 L. ed. 745, it was found that the rate pre-

scribed by legislative act was barely sufficient to pay the costs of operation. In discussing such fact, Justice Hughes, speaking on behalf of the court, said: "It is apparent, from every point of view that this record permits, that the statutory rate at most affords a very narrow margin over the cost of the traffic. It is manifestly not a case where substantial compensation is permitted and where we are asked to enter the domain of the legislative discretion; nor is it one in which it is necessary to determine the value of the property employed in the intrastate business. It is clear that by the reduction in rates the company is forced to carry passengers, if not at or below cost, with merely a nominal reward, considering the volume of the traffic affected. We find no basis whatever upon which the rate can be supported, and it must be concluded, in the light of the principles governing the regulation of rates, that the state exceeded its power in imposing it."

The property managed and controlled by the trustees is devoted to a public use and the trustees on behalf of the trust estate are entitled to reasonable compensation for such use. It requires no argument to demonstrate that a rate of fares which does not produce income sufficient to meet operating expenses is confiscatory. It presents a case where a court of equity. will act to prevent continued irreparable loss. The trustees were entitled to a temporary increase of fares sufficient to meet operating expenses.

The contention of the trustees that they are entitled to rates that will yield a reasonable return upon the property invested raises a question as to whether the trustees have met the burden of proving facts essential to the establishment of a rate base. It is axiomatic that, if the rates in force do not produce sufficient revenue to meet operating expenses, there is nothing returnable as compensation on the investment, but the establishment of a rate base involves the fixing of the value of the property devoted to

the public use, an element which is not essential to a balancing of operating income against operating expense.

Have the trustees met the burden of submitting facts from which the valuation of the property may be determined? The trustees alleged the value of the property used and useful in the public service was $96,265,000. When the matter was before the commission on the petition for temporary increase and the approval of schedule 5, that body fixed the value at $36,000,000. The special master found it to be $80,000,000, and the trustees did not file exception to such finding. The view taken of the case makes it unnecessary to consider the evidence as to original cost, reproduction cost less depreciation, fair value and other items which are essential to the fixing of a rate base.

The property of this utility is under the jurisdiction of the Federal court and since 1937 there has been pending a reorganization proceeding under section 77B of the Bankruptcy Act. The details of the issues pending in that proceeding are not before us, but it does appear by the commission's order that the prior preferred stock series A and B, and the common stock of the transit company are carried at $6,500,000, that the company has a funded indebtedness slightly in excess of $58,000,000, which the commission says has a value of approximately $3,500,000. The case made by these findings and other evidence appearing in the record clearly indicates that the Federal court assumed jurisdiction to preserve the property for the benefit of the parties interested and to administer it in a liquidation or a reorganization of the corporation. Obviously, one of the main issues before the Federal court is the value of that property and any fixing of a rate base in this case would have a vital effect upon that question. It is true the physical property of the utility is the principal item to be valued, but nevertheless, any rate base that

would be established in this case would seriously affect that value. In *Colorado Interstate Gas Co.* v. *Federal Power Commission,* (U. S.) 89 L. ed. 807, it was said: "When rates of a utility are fixed the value of its property is affected." No inference should be drawn from what has been said that any rate base would be favorable or unfavorable. to the parties interested in the property of the utility.

The evidence also shows that the trustees' petition for an increase of intercompany fares is pending before the commission. It appears to be conceded that the delay in closing that proceeding is caused by the controversy that exists between the trustees, the surface lines and the motor coach as to the division of the fares. There is also evidence that litigation is pending to determine whether the trustees may reject a lease for a part of the line included within the system. It further appears that the surface lines collectively included several corporations, some of which are in receivership. There are statements in the orders of the commission indicating that there is controversy between the plaintiffs and some of the receivers of the surface lines as to the amount that is due the trustees.

Enough has been stated to show that the trustees have not presented a case upon which a rate base for returns on investment may be determined.

The points presented in the brief filed on behalf of the Economic Stabilization Director and Price Administrator are, in the main, the same as those presented by the defendants and which have already been considered.

For the reasons assigned, the decree of the circuit court is reversed and cause remanded, with directions to enter a decree in accordance with the views expressed.

*Reversed and remanded, with directions.*