(No. 51621.—

JERRY GRAHAM, Appellee, v. THE ILLINOIS RACING BOARD, Appellant.

*Opinion filed September 19, 1979.*

William J. Scott, Attorney General, of Springfield (Paul J. Bargiel, Patricia Rosen, and Edward M. Kay, Assistant Attorneys General, of Chicago, of counsel), for appellant.

Kenneth R. Siegan, of Chicago (J. Graham Carpio and Joel D. Weisman, of counsel), for appellee.

MR. CHIEF JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, the Illinois Racing Board, appealed from the order of the circuit court of Cook County enjoining and restraining it from proceeding with any hearing against the plaintiff, Jerry Graham, "utilizing any tests or specimens involved in this instant chancery action." Pursuant to Rule 302(b) (58 Ill. 2d R. 302(b)), we allowed defendant's petition for direct appeal to this court.

In his original complaint, filed December 15, 1978, plaintiff alleged in count I that he was in the business of owning, training, and driving harness racing horses. He alleged further that the Board, pursuant to statutory authority (Ill. Rev. Stat. 1977, ch. 8, par. 37—9(b)), had promulgated the following rules:

> "Rule 21.13. Every race track operator shall provide a suitable detention barn where the specimens provided for in Rule 21.12.a can be taken under the direction of the state veterinarian. Such detention barn shall satisfy standards prescribed by the state veterinarian. In addition, every race track operator shall furnish during racing hours

a guard whose duty shall be to guard such stall space and such specimens. Such guard shall remain on duty until the specimens have been delivered to the Board laboratory."

"Rule 21.19. Every owner, trainer, groom, or care-taker, must guard or cause to be guarded each horse owned, trained, or attended by him in such a manner as to prevent any person from administering to such horse any chemical substance in violation of these rules."

Plaintiff alleged that although he had conformed with the Board's rules, including Rule 21.19, the Board had violated its Rule 21.13 by not requiring racetrack opera-tors to provide a separate guard to remain on duty until the specimens had been delivered to the laboratory. Plaintiff alleged further that in hearings recently held a chief urine collector for the Board had testified that Rule 21.13 had frequently been violated in that "sign-in" entries were falsely made, and that there were numerous improprieties in the manner in which the samples were collected and delivered; that the Board's failure to preserve properly the chain of custody of the specimens inade-quately protected owners, trainers, and drivers from the possibility of the specimens' adulteration by other persons and from their being unjustly accused of violations of the Board's rules.

It was also alleged that despite its failure to comply with its own rule, the Board had charged plaintiff with various rules violations and had scheduled a hearing for December 18, 1978, at which time the Board proposed to introduce testimony, test results, and documents concern-ing the specimens that were "kept, transported, and delivered" in violation of Rule 21.13. Plaintiff alleged that if the Board held its hearing he would be irreparably harmed in that his reputation and earning capacity would be severely damaged; that he had no adequate remedy at law; and that the Board would suffer no injury should an injunction issue. In his prayer for relief plaintiff sought a preliminary injunction ordering the Board to comply with

Rule 21.13, a temporary restraining order enjoining the Board from proceeding with any hearing involving the alleged existence of drugs in horses, a preliminary injunction enjoining the Board from proceeding with a hearing involving the alleged existence of drugs in plaintiff's horses, a temporary restraining order enjoining the Board from utilizing as evidence any specimen taken where a guard was not present from the time it was collected until the time it was delivered to the laboratory, and a hearing to determine whether the evidence intended to be used by the Board was illegally gathered. Plaintiff also prayed that upon a final hearing the injunctions should be made permanent.

In count II plaintiff incorporated the allegations of count I, adding that the Board would not be harmed by a postponement of the hearing since the relevant events occurred as long ago as July 1978. The prayer for relief in count II was substantially identical to that contained in count I.

On the day that plaintiff's complaint was filed, the circuit court ordered that both the Board hearing and the hearing on the temporary restraining order be continued to December 19, 1978. On that date the Board filed a motion to dismiss, asserting that under the Administrative Review Act (Ill. Rev. Stat. 1977, ch. 8, par. 37–46; Ill. Rev. Stat. 1977, ch. 110, par. 264 *et seq.*) plaintiff had an adequate remedy at law; that plaintiff had failed to show irreparable injury; and that he had failed to state a cause of action upon which relief may be granted. After a hearing the circuit court entered an order denying the Board's motion to dismiss and issued a temporary restraining order enjoining the Board from proceeding with any hearing against plaintiff. The Board filed notice of interlocutory appeal to the appellate court; after this court allowed the Board's motion for direct appeal the two appeals were ordered consolidated.

On December 28, 1978, the Board filed its answer to plaintiff's complaint, denying the material allegations and alleging that any evidence used against plaintiff would be "based upon a nationally recognized, secure procedure for preserving the chain of evidence." The Board then pleaded as affirmative defenses the same matters that had been raised in its motion to dismiss, adding that the harm caused to the Board and to the public by an injunction would greatly outweigh the harm to plaintiff, and that plaintiff would have an opportunity at the administrative hearing "to cross-examine witnesses regarding the chain of evidence" used to protect the specimens.

At the hearing before the circuit court the Board's executive secretary, a Board chemist, and the two chief urine collectors who had taken the specimens involved, testified as to the procedure employed in collecting and testing the urine samples from plaintiff's horses. After a race the horse was bathed, watered, and taken to a detention barn attended by a guard. There, a urine taker assigned by his supervisor would, in the presence of the owner, trainer, or his representative, take a urine sample. The sample was then taken to the supervisor, who split the sample into two jars—a "laboratory" sample for testing purposes and "referee" sample for additional use should the test for drugs prove positive. The owner, trainer, or his agent would sign the ticket, indicating that the specimen was taken from his horse. The ticket, which was divided into the upper and lower parts with each containing an identifying number, was cut; the upper part was attached to the "referee" jar, while the lower part (containing the witness' signature and other pertinent information) was put into an envelope. The blood and urine samples from an entire afternoon or evening of racing were then collected into a metal box; also put into the box were the sealed envelope containing the tickets on all the specimens and a master sheet containing the same information as the

various tickets. The metal box was then locked, with the lock's combination unknown to the supervisor; a tape seal was also attached to the opening of the box, its number having been recorded on the master sheet inside the box. The box was then taken to the Board laboratory—usually by the supervisor, but occasionally by another Board employee—and put into a locked freezer.

A chemist - laboratory supervisor at the Board's laboratory testified that, after removing the box from the freezer, the laboratory technician would inspect the box's exterior to see if the seal were intact and the lock were closed. The box would then be opened and the number on the box's seal checked against the number on the master sheet inside the box. If it appeared that the box or samples had been tampered with a notation was made on the master sheet. The specimens were then removed and the laboratory samples analyzed.

On January 9, 1979, after the conclusion of the hearing, the circuit court issued a permanent injunction prohibiting the Board from proceeding with any hearing against plaintiff that would utilize the tests or specimens involved in the present case. The court also found that plaintiff had no adequate remedy at law, that he would be irreparably harmed if the injunction were not granted, and that the probability of damage to the Board as a result of the injunction was remote.

Plaintiff had filed an amended complaint on January 4, 1979, and on January 10, 1979, filed a second amended complaint. The amended complaints were substantially identical to the original complaint except for the additional allegation that the Board had violated its Rule 25—3B, which provided:

> "A guard shall be hired from the Race Track Police to stand watch at the State Detention Barn and to transport samples to the State Testing Laboratories."

The Board contends that plaintiff's suit for an

injunction was barred by the doctrine of sovereign immunity, that the injunction was improperly granted because of plaintiff's failure to exhaust his administrative remedies, and that he had failed to satisfy the prerequisites for an injunction. The latter two contentions are different versions of the same basic argument, that equitable relief should not be granted because plaintiff has failed to exhaust the available administrative remedies.

Previous decisions of this court hold that administrative remedies must be exhausted prior to seeking equitable relief except where an ordinance or statute is attacked as unconstitutional in its entirety, where multiple remedies exist before the same administrative agency and at least one has been exhausted, where irreparable harm will result from further pursuit of administrative remedies (*Illinois Bell Telephone Co. v. Allphin* (1975), 60 Ill. 2d 350, 358), or where it would be patently useless to seek relief before the administrative agency (*Northwestern University v. City of Evanston* (1978), 74 Ill. 2d 80, 88). It is plaintiff's position that the legal remedy available in this case—suppression at the license revocation hearing of the allegedly improperly preserved evidence—is inadequate. Plaintiff contends that the mere commencement of a hearing at which the Board could attempt to introduce into evidence the disputed specimens would so harm his reputation and livelihood that no remedy at law can be considered adequate.

The Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1977, ch. 8, par. 37—1 *et seq.*) vests the Board with the authority to suspend or revoke the occupation license of any horse owner, trainer, or driver whose work is conducted upon racetrack grounds in this State. (Ill. Rev. Stat. 1977, ch. 8, par. 37—16(a).) The Act also provides that any person whose license is suspended or revoked by the Board-appointed stewards or judges (see Illinois Racing Board Rules and Regulations of Harness Racing, Rule

6.11) may request a hearing before the Board. (Ill. Rev. Stat. 1977, ch. 8, par. 37—16(c).) The chairman of the Board designates a Board member to act as hearing officer. (Illinois Racing Board Rule A4.04(a).) While the hearing officer is not bound by the technical rules of evidence, the rules of evidence governing nonjury civil proceedings in this State "shall be taken into consideration." (Rule A4.10(c).) The Board's rules further allow the admission of all relevant evidence, but hearsay and cumulative evidence may be excluded (Rule A4.10(b)); inadmissible evidence may be excluded on the hearing officer's own motion or upon the objection of any party (Rule A4.10(e)). A transcript of the hearing is produced and is available for public inspection in the Board's principal office. (Rule A4.05(a).) At the conclusion of the hearing, the hearing officer may make a recommendation to the Board, which then makes the final decision and issues findings of fact and conclusions of law. The Illinois Horse Racing Act of 1975 provides (Ill. Rev. Stat. 1977, ch. 8, par. 37—46) that the Board's decision is subject to judicial review pursuant to the provisions of the Administrative Review Act (Ill. Rev. Stat. 1977, ch. 110, par. 264 *et seq.*).

The Administrative Review Act empowers the circuit court to review the entire record of the administrative proceedings, including all questions of law and fact (Ill. Rev. Stat. 1977, ch. 110, par. 274), and the order or judgment of the circuit court is reviewable by appeal as in other civil cases (Ill. Rev. Stat. 1977, ch. 110, par. 276).

The administrative proceeding and the available judicial review provide ample opportunity to determine the admissibility into evidence of the urine specimens, and we are not persuaded that plaintiff was without an adequate remedy at law. The proceedings commenced against plaintiff by the Board would result in no greater harm to his reputation than that suffered by one required to defend against a criminal prosecution brought lawfully and

in good faith. We note further that only rarely will courts of equity enjoin criminal prosecutions. *Younger v. Harris* (1971), 401 U.S. 37, 43-44, 27 L. Ed. 2d 669, 675, 91 S. Ct. 746, 750; *Cleary v. Bolger* (1963), 371 U.S. 392, 397, 9 L. Ed. 2d 390, 394, 83 S. Ct. 385, 388; *City of Chicago v. Chicago City Ry. Co.* (1906), 222 Ill. 560, 570.

*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, and *Kalman v. Walsh* (1934), 355 Ill. 341, relied upon by plaintiff to support his position, are not in point. In *Bio-Medical,* the plaintiff was a vendor licensed to participate in the medical assistance (Medicaid) program operated by the Department of Public Aid. The Department, after conducting an audit of the plaintiff's billing procedures and discovering certain discrepancies, estimated that the plaintiff had been overpaid by about $320,000 from the Medicaid program during an 18-month period. After plaintiff failed to turn over its records, the Department's auditors recommended that the plaintiff be suspended from participating in the Medicaid program and that action be taken to recover the overpayment. The plaintiff, alleging that the Department lacked the authority to take such action, sought an injunction to restrain the Department's director from suspending plaintiff from the Medicaid program. The circuit court granted the injunction and we affirmed. Among other defenses raised in that case, the Department claimed that plaintiff had failed to show irreparable harm or an inadequate remedy at law. The court rejected these contentions, noting that the Department did not deny that the source of 90% of plaintiff's business was Medicaid payments. It could reasonably be inferred, the court said, that the wrongful suspension of the plaintiff from the Medicaid program would cause damages of uncertain magnitude and that a subsequent action by plaintiff for damages would not be as practical and efficient as an action for injunctive relief. 68 Ill. 2d 540, 549.

Although here plaintiff is also threatened with a loss of potential income which may be difficult to assess, unlike the situation in *Bio-Medical,* statutory authority exists for the Board's right to suspend or revoke plaintiff's license as a horse owner, trainer, or driver. Additionally, procedures not available in *Bio-Medical* are provided to allow plaintiff to refute charges brought against him by the Board.

In *Kalman v. Walsh* (1934), 355 Ill. 341, several dentists sought to enjoin the dental committee of the Department of Education and Registration from proceeding in a pending hearing to revoke or suspend the plaintiffs' dentistry licenses. This court found that the notice given to the plaintiffs by the director of the Department did not conform with the statutory requirement that "written charges" alleging violations of the dental surgery act be filed and that the dental committee before whom the charges were to be heard was, therefore, without jurisdiction to hear them. We note, too, that *Kalman* was decided prior to the enactment of the Administrative Review Act, and the availability of judicial review therein provided would have served to lessen the force of the plaintiffs' contention that they were without an adequate remedy at law.

We do not agree with plaintiff's contention that the rules which he charges the Board violated were "administrative decisions" as that term is defined by section 1 of the Administrative Review Act (Ill. Rev. Stat. 1977, ch. 110, par. 264), and therefore subject to judicial review. That section explicitly provides that "The term 'administrative decision' or 'decision' does not mean or include rules [or] regulations *** issued by an administrative agency to implement, interpret, or make specific the legislation enforced or administered by it unless such a rule [or] regulation *** is involved in a proceeding before the agency and its applicability or validity is in issue in such

proceeding ***." (Ill. Rev. Stat. 1977, ch. 110, par. 264.) Until the Board has conducted a hearing, it can hardly be said that the rules in question were actually involved in a proceeding before the agency.

In view of our conclusion that plaintiff failed to exhaust his administrative remedies we do not consider the other issues briefed and argued by the parties.

For the reasons stated, the order of the circuit court granting an injunction is reversed.

*Order reversed.*