RICHARD KURTZWORTH, Plaintiff-Appellee, *v.* ILLINOIS RACING BOARD *et al.*, Defendants-Appellants.—JIM BAKER, Plaintiff-Appellee, *v.* RICHARD GARRETT *et al.*, Defendants-Appellants.—GARY DE LONG, Plaintiff-Appellee, *v.* OGDEN FAIRMOUNT, INC., *et al.*, Defendants-Appellants.—DONALD K. WALLIN, Plaintiff-Appellee, *v.* OGDEN FAIRMOUNT, INC., *et al.*, Defendants-Appellants.—LANNY KRESS, Plaintiff-Appellee, *v.* CAHOKIA DOWNS, INC., *et al.*, Defendants-Appellants.—GARY BETZER, Plaintiff-Appellee, *v.* ILLINOIS RACING BOARD, Defendant-Appellant.

Fifth District   Nos. 78-164, 78-281, 78-292, 78-293, 78-386, 78-164, 78-517 cons.

Opinion filed January 7, 1981.

William J. Scott, Attorney General, of Chicago (Gail A. Moreland, Assistant Attorney General, of counsel), for appellants.

William E. Brandt, of Granite City, for appellee Gary Betzer.

Hillebrand & Cook, of East St. Louis (Bruce N. Cook, of counsel), for appellee Jim Baker.

Leon G. Scroggins, Sr., of Granite City, for appellee Richard Kurtzworth.

Dennis W. Shevlin, of Belleville, for appellee Lanny Kress.

No brief filed for appellees Gary DeLong and Donald K. Wallin.

Mr. JUSTICE JONES delivered the opinion of the court:

We have consolidated for opinion five cases in which we consider the propriety of certain temporary restraining orders and ensuant preliminary injunctions which, in similar though not identical terms, stayed the suspension of horse-racing-related licenses by certain agents of the Illinois

Racing Board (Board). The preliminary injunctions were to remain in effect until disposition of administrative appeals by the Board.

The Illinois Racing Board and stewards are charged by law with regulating horse racing in Illinois (see the Illinois Horse Racing Act of 1975, Ill. Rev. Stat. 1977, ch. 8, par. 37—1 *et seq.*). The Illinois Racing Board is a department of State government and its members are executive officers appointed by the Governor. (Ill. Rev. Stat. 1977, ch. 8, par. 37—4.) Racing stewards are representatives of the Board at race tracks licensed by the Board, and they supervise horse racing meetings as provided by the rules and regulations of the Board. (Ill. Rev. Stat. 1977, ch. 8, par. 37—3.19.) The stewards are empowered to investigate violations of Board rules and to revoke or suspend the licenses of horse owners, trainers, jockeys, concessionaries, and other occupational licensees upon a finding that the rules have been violated. (Ill. Rev. Stat. 1977, ch. 8, par. 37—16.) The stewards' findings may be appealed to the full Board, where a trial *de novo* occurs, and then to the circuit court on administrative review. Ill. Rev. Stat. 1977, ch. 8, pars. 37—16(c) and 37—46.

A brief description of the proceedings in each of the five cases will suffice for our disposition. Our number 78-164 is Richard A. Kurtzworth v. Illinois Racing Board and Steward's Office, Cahokia Race Track, filed in St. Clair County. The complaint alleged that Kurtzworth was licensed as owner, trainer and driver (in harness races) by the Illinois Racing Board and other authorities and associations. He was hired by a veterinarian from St. Louis to transport a yearling filly to Ohio. Because of the temperament of the horse he was furnished medications with syringes and needles for administration during the trip. Upon his return to the track, being aware of the rules, he removed from his person all equipment but by oversight neglected to remove one needle. Upon entering the track enclosure on March 16, 1978, agents of the Illinois Bureau of Investigation conducted a warrantless search of his person and discovered the needle. The search was asserted to be illegal. On March 21, 1978, the stewards at Cahokia Race Track conducted a hearing which resulted in a 30-day suspension of the plaintiff. Plaintiff's sole profession is as owner, trainer and driver and the suspension would severely damage him. Plaintiff had a horse, "Hastings," entered in the seventh race at Cahokia on March 23 and he alleged that if the illegal suspension is allowed to remain in force the damage to plaintiff will be irreparable and a temporary injunction is necessary and proper. The complaint concluded with a prayer "❋ ❋ ❋ that this court conduct an immediate hearing and issue an injunction restraining the Illinois Racing Board and the Stewards Office at Cahokia from the suspension of the Petitioner."

On the same date of March 23, 1978, the court, without notice of

bond, issued a "temporary injunction" to remain in force until March 27, 1978, at 9 a.m. at which time a hearing was to be held. The writ recited:

"＊ ＊ ＊ you are hereby enjoined and restrained temporarily from [sic] That the action of suspension in this cause by the steward's [sic] of the Illinois Racing Board is unduly harsh; That the full suspension deprives the Plaintiff of his livelihood; That he will be unable to earn a living and therefore irreparably harmed; That the facts do not warrant the action taken by the Stewards. A temporary injunction issue to remain in force until Monday March 27, 1978. Richard Kurtzworth is allowed to race 'Hastings' in the 7th tonight; 'Barkley' on the 24th; 'Garrett' on the 25th, said horses having been previously entered. Plaintiff to enter no further Horses. HEARING MARCH 27, 1978, 9:00 a.m."

A hearing was held as scheduled. The defendants objected to the jurisdiction of the court, contending that section 16 of the Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1977, ch. 8, par. 37—16(a) through (c)) vests jurisdiction in the Illinois Racing Board until it reaches a final decision. In the ensuing order the objection to jurisdiction was denied and "＊ ＊ ＊ the injunction heretofore issued in this cause is continued in full force and effect until a final decision is rendered by the Illinois Racing Board." Our numbers 78-292 and 78-293 were consolidated for hearing in the circuit court of Madison County. No. 78-292 is Gary DeLong v. Ogden Fairmount Jockey Club, Ogden Fairmount, Inc., Illinois Racing Board and three named individuals who are stewards of the Illinois Racing Board. DeLong's complaint, filed June 5, 1978, alleges that he is a jockey licensed by the Board, a quasi-judicial administrative body with authority over parimutuel horse racing in Illinois, per the Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1977, ch. 8, par. 37—1). On the evening of June 2, 1978, the individual defendants, stewards at Fairmount Race Track, gave notice they would conduct a hearing to revoke or suspend plaintiff's right to do business (as a jockey) at the track at 10 a.m. on June 3, 1978. The notice recited that the action was being taken because plaintiff had been indicted in one count by the grand jury of Madison County for failure to report an offer of a bribe relating to the 10th race at Fairmount on April 28, 1978. The June 3, 1978, hearing was held, but plaintiff was not afforded the right to counsel, the right to cross-examine witnesses and was not allowed to be present during the presentation of evidence against him. As a result of the hearing the plaintiff was ordered suspended from appearing at Illinois race tracks. The said Act provides for appeal and administrative review pursuant to the Administrative Review Act but does not provide for damages to the suspended person or for a stay of "sentence" for the suspended person. DeLong's complaint alleged further

that unless the court restrained enforcement of the suspension order the plaintiff would lose his income and be punished while his appeal was pending, thereby causing him to suffer irreparable harm. Plaintiff has applied for a trial *de novo* before the Racing Board.

The complaint concluded with a prayer for a temporary restraining order to be issued immediately, without notice and without bond, ordering defendants not to enforce the order of suspension and for a hearing to be held within 10 days to consider raising the order or making it permanent. Although Ogden Fairmount, Inc., and Ogden Fairmount Jockey Club were made parties defendant, their names were not mentioned in the body of the complaint.

Our number 78-293 is the case of Donald K. Wallin against the same defendants named in the *DeLong* case. The complaint, also filed June 5, 1978, is similar to that in the *DeLong* case in that the plaintiff was indicted for failure to report a bribe and, after the same procedure described for DeLong, his license was suspended. The complaint in *Wallin* differs in one respect from that in *DeLong*. Wallin alleged that Ogden Fairmount, Inc., purportedly acting pursuant to section 9(e) (Ill. Rev. Stat. 1977, ch. 8, par. 37—9(e)) barred him from Fairmount Park Race Track because he was indicted by the Madison County grand jury and that that action, taken without notice or hearing, was in violation of his "constitutional rights to trial by jury and to the presumption of innocence." The prayer of the *Wallin* complaint is identical to that of the *DeLong* complaint.

Proceedings and orders subsequent to the filing of the complaints in both *Wallin* and *DeLong* are identical. The circuit court issued a temporary restraining order, without notice or bond, against all defendants, restraining them from enforcing the June 3, 1978, order of suspension. Hearing for preliminary injunction was set for June 15, 1978. After the hearing the following order was entered in both cases:

> "Hearing had. The Temporary Restraining Order issued on June 5, 1978, is hearby made a Preliminary Injunction and is to remain in full force until the Illinois Racing Board has rendered a decision in this matter."

Our numbers 78-164 and 78-517 are embraced in Gary Betzer v. Illinois Racing Board. Plaintiff Betzer filed a complaint against the Illinois Racing Board, individual stewards of the Board, Ogden Fairmount, Inc., and Ogden Fairmount Jockey Club, Inc. Eventually all defendants except the Board were dismissed out of the suit. Plaintiff alleged that he was licensed by defendant Board as a jockey's agent. He was indicted by a grand jury of Madison County for corrupt practices which consisted of offering bribes to jockeys DeLong and Wallin. As a result of the indictment the jockey club (race track) barred plaintiff from the track, and the Board and its stewards suspended his license, all of which action

was taken without affording plaintiff an opportunity to appear and be heard. Although the criminal charges contained in the indictment were dismissed the defendants refused to reinstate the plaintiff. In his complaint plaintiff attacked the constitutionality of relevant statutes and prayed for a temporary restraining order and preliminary injunction, both of which were ultimately entered against the Board only. No duration was fixed for the preliminary injunction, but the order found that the plaintiff had no adequate remedy of law, that the threatened injury would be immediate and great, that plaintiff had a reasonable likelihood of prevailing on the merits and that the preliminary injunction would not have an injurious effect on the general public. The court also found in its order for preliminary injunction that section 9(e) of the Horse Racing Act was unconstitutional. This court granted a stay of the preliminary injunction on December 19, 1978.

Our number 78-386 is Lanny Kress v. Cahokia Downs, Inc., East St. Louis Jockey Club, Illinois Racing Board and three named individuals who are stewards of the Illinois Racing Board. On August 4, 1978, plaintiff filed a verified complaint in the circuit court of St. Clair County for temporary restraining order and preliminary injunction. He alleged he was a jockey licensed by the Illinois Racing Board, a quasi-judicial administrative board organized under the Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1977, ch. 8, par. 37—1 *et seq.*). On August 2, 1978, the individual defendants, stewards of Fairmount Race Track, gave plaintiff notice of hearing to be held on August 3, 1978, to revoke or suspend plaintiff's right to do business at race tracks in Illinois. The hearing was held but plaintiff was not allowed to confront or cross-examine witnesses. Testimony presented at the hearing established that a "D.O.I. Agent" searched "the truck" and plaintiff's wallet and discovered prescription pills and a small amount of marijuana. Plaintiff involuntarily signed a waiver allowing the search, and all the evidence consisted of incompetent evidence. Plaintiff was suspended for 30 days. The complaint further alleges that the Act and Rules provides for an appeal and judicial review, but the suspension order is immediate, and unless the defendants are restrained from enforcing the suspension order pending appeal the plaintiff will lose his income and suffer irreparable harm. Plaintiff is entitled to trial *de novo* before the Racing Board and had requested the same.

The complaint concluded with a prayer for a temporary restraining order against enforcement of the order of suspension, and for a hearing within 10 days to consider the raising or making permanent the restraining order. On August 4, 1978, the trial court issued a temporary restraining order, without notice or bond, against all defendants, restraining them from enforcing the order of suspension. The matter was set for further

hearing on August 14, 1978. On that date, following a hearing, the following order was entered:

"The court orders that a preliminary injunction issue against the defendants restraining the defendants from enforcing its order of suspension against the plaintiff until further order of court."

Our number 78-281 is Jim Baker v. Richard Garrett and Illinois Racing Board. On March 31, 1978, plaintiff filed a complaint for temporary restraining order and injunction in the circuit court of St. Clair County. He alleged that he was licensed by the Board to conduct a "Tack Room" business and that it is the whole support for himself and his family. The Board is a quasi-judicial administrative body organized under the Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1977, ch. 8, par. 37.1 *et seq.*), and Richard Garrett is an assistant State steward appointed pursuant to that Act. On March 15, 1978, pursuant to section 16 of the Act, defendant Garrett gave notice that he would conduct a hearing on March 23, 1978, to suspend or revoke plaintiff's right to do business at Cahokia Race Track. The notice never specified any wrongful acts plaintiff had committed but merely recited the rules and regulations of the Board. The hearing board of stewards had participated in the investigation against the plaintiff and discussed the evidence with officers of the D.O.I. (Illinois Department of Investigation) and indicated a prejudgment prior to the hearing. The evidence against the plaintiff consisted of all incompetent evidence. The plaintiff was ordered suspended for the remainder of 1978. A copy of the suspension order was attached to the complaint. It recited that the suspension was for possession and sale of prescription drugs to licensed horsemen while on the grounds of Cahokia Downs and Fairmount Park, the plaintiff not possessing a pharmacist's license and having no right to possess or sell drugs on a race track. The Act and Rules provided for an appeal and judicial review, but the suspension order is immediate and plaintiff is ordered off the track pending appeal. Unless the court restrains defendants from enforcing the suspension order plaintiff will lose his income, be punished while his appeal is pending and suffer irreparable harm. Plaintiff was not accused nor was it alleged that he sold or possessed any substance that was capable of influencing a horse on a race track. Plaintiff is entitled to a trial *de novo* before the Racing Board and has requested same.

The complaint concluded with a prayer that a temporary restraining order be issued ordering the defendants not to enforce their order of suspension and for a hearing to be held within 10 days to consider the raising of or making permanent the said order. On March 31, 1978, the court issued a temporary restraining order restraining defendants from enforcing the suspension of the license of plaintiff to do business on Illinois race tracks and from enforcing the suspension order of defendant

Garrett of March 29, 1978. Further hearing on the temporary restraining order was set for April 10, 1978. Hearing was held on that date and an order thereon entered on May 8, 1978. In the order the court found plaintiff would suffer irreparable harm should a preliminary injunction not issue and that no hardship will result to defendants, that the doctrine of exhaustion of administrative remedies is inapplicable to the case and that plaintiff has made a timely appeal for a hearing *de novo* before the Board. It was then ordered that a preliminary injunction issue enjoining defendants from enforcing the suspension order pending hearing before the Board and the plaintiff's appellate proceedings, if any. It was further ordered that defendant not interfere with plaintiff's continuance in his employment at the local race tracks pending hearing before the Racing Board and plaintiff's appellate proceedings, if any.

Defendants have taken an interlocutory appeal from the orders for preliminary injunction in all five cases pursuant to Supreme Court Rule 307(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 307(a)).

In a supplemental brief filed by the appellants this court was advised that, following the issuance of the preliminary injunctions, the plaintiffs pursued their administrative remedy of appeal to the Board. Kurtzworth's suspension was upheld by the Board and by the circuit court upon administrative review. DeLong was reinstated by the Board. The suspensions of Baker and Kress were upheld by the Board. There has been no final administrative action by the Board with regard to Wallin.

It thus appears that the preliminary injunctions in *Kurtzworth,* *DeLong* and *Baker* have expired by their terms. The preliminary injunction in *Kress* was to be in effect "until further order of court." Although the suspension of Kress' license was upheld by the Board and the time of suspension has since expired, we are not made aware of any further orders of court, and presumably the preliminary injunction in *Kress* is moot.

Although nothing appears of record to indicate mootness as to Wallin, we deem it likely that that condition also pertains in his case. We judicially note that in People of the State of Illinois v. Donald Wallin, Fifth District, No. 78-306, this court filed an unpublished order on September 21, 1979, in which we affirmed an order of the circuit court of Madison County suppressing certain statements of the defendant to a steward at the Fairmount Park Race Track in a case where Wallin was being prosecuted for failure to report a bribe. Nothing appears of record to indicate what further proceedings were had or what disposition was made of the *Betzer* case. We can only presume that since the criminal charges were dropped his case also became moot. Nothing of record suggests proceedings beyond the entry of the preliminary injunction order and its stay by this court.

In the face of both real and apparent mootness of all cases involved in this appeal the appellants submit and argue the issue that the public interest nevertheless requires a determination of the appeals. They pose the question:

"Whether the public interest requires a determination by the Court of the propriety of injunctive relief where such relief prevents a department of state government from discharging its lawful responsibility, where state revenues are adversely affected, and where such relief promotes practices detrimental to the public good?"

■■ The general rule is that when a reviewing court has notice of facts which show that only moot questions or mere abstract propositions are involved, or where the substantial questions involved in the trial court no longer exist, it will dismiss the appeal. But when the issue presented is of substantial public interest there is a well-recognized exception to the general rule. Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers and the likelihood of future recurrence of the question. *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 104 N.E.2d 769; *Illinois News Broadcasters Association v. City of Springfield* (1974), 22 Ill. App. 3d 226, 317 N.E.2d 288; *Johnson v. Board of Education* (1967), 79 Ill. App. 2d 22, 223 N.E.2d 434.

We have determined that the criteria are present in this case to a degree sufficient to warrant consideration of the two issues presented in these cases.

Authority to grant writs of injunction, temporary restraining orders and preliminary injunctions is conferred by "An Act to revise the law in relation to injunctions (Ill. Rev. Stat. 1979, ch. 69). It is unnecessary to discuss the width and breadth of the injunctive powers of the circuit courts. Authority for issuance of injunctions is not in question. It is the application of injunctive authority in the peculiar facts of this case that defendants call into question. Their position with regard to the propriety of the preliminary injunctions as issued is stated in separate briefs filed in each consolidated case. Most of defendants' objections generally relate to the traditional defenses interposed to the issuance of a preliminary injunction. These are disposed of by the posture of mootness and have no bearing on the public policy questions we consider. However, we deem two of defendants' objections germane, plaintiffs' failure to exhaust their administrative remedy, and violation of the constitutional doctrine of separation of powers. Defendants' briefs filed in the separate cases vary somewhat in their descriptions of the issues we address. Nevertheless,

they present a central theme from which we easily form primal issues. Examples of the defendants' arguments are these:

"The instant injunctions have had the deleterious effect of allowing plaintiffs to circumvent statutory remedies and to prevent the Board from carrying out the intention of the legislature with regard to racing."

"Not only has the legality of the Board's conduct never been challenged by plaintiffs, the records demonstrate beyond doubt that it was plaintiffs who violated the law."

"Betzer alleged, and the circuit court found, that sec. 37—9(e) of the Horse Racing Act was unconstitutional as applied to him. However, this argument did not relieve him of the duty to pursue his administrative remedies as it is well settled that administrative remedies must be exhausted unless the relevant statutes' unconstitutionality is attacked on its face. [Citation.] Moreover, injunctive relief is improper unless the statute is alleged to be unconstitutional on its face. [Citation.]"

These arguments go directly to the issues as we have posited them, and they require resolution for future guidance of public officials and present issues that are likely to be of a recurring nature. The issues which we believe are presented and which we will address are (1) whether the circuit court in the exercise of its traditional chancery powers of injunction may intrude other than by judicial review into administrative hearing proceedings; and (2) were the plaintiffs deprived of due process of law when their race-track-related licenses were suspended by the race track stewards pending a hearing before the Illinois Racing Board?

The first issue arose in all the cases we have under consideration when the plaintiffs-licensees filed complaints in the circuit courts of their respective counties seeking a temporary restraining order and/or a preliminary injunction. In none of the complaints did the plaintiffs seek relief upon any substantative issue that was being submitted to the court for consideration. The courts were not asked to rule upon the merits of any cause of action. No attack was made upon the validity of any statute or rule except in *Betzer*. Each complaint concluded with a prayer for the solely provisional relief of temporary restraining order and preliminary injunction, to remain in effect until such time as the Board had issued its ruling on the hearings which were to follow the suspension action of the stewards. In the instance of each plaintiff, the provisional relief was granted in terms that tied the expiration of the provisional relief to the administrative determination of the Board.

We can find no Illinois precedent for such procedure. In *P.S.L. Realty Co. v. Granite Investment Co.* (1976), 42 Ill. App. 3d 697, 356

N.E.2d 605, we held that a preliminary injunction (and, necessarily, a temporary restraining order) is an ancillary and provisional remedy and cannot constitute the ultimate relief afforded with respect to the matter in dispute. It was further determined on appeal that since the remedy of preliminary injunction was pursued as the only relief sought, the preliminary injunction must be dissolved.

The cases at bar, the complaints being for purely provisional relief from the circuit courts, superficially beg for invocation of the rule of the *P.S.L. Realty Co.* case with the consequence of dissolution. However, there is an important difference. In *P.S.L. Realty Co.*, there was no averment in the complaint asking substantative relief in the merits of a claim or linking the sought after preliminary injunction with proceedings pending or contemplated in another tribunal. In the cases under consideration the preliminary injunctions were linked to pending or contemplated administrative hearings as we have described. Accordingly, we cannot invoke the rule of the *P.S.L. Realty Co.* case as dispositive here.

The issue under consideration can perhaps be more pointedly drawn by brief allusion to some general principles and applications that are not involved.

Under the proper circumstances proceedings before administrative tribunals may be enjoined when a court exercising chancery powers assumes jurisdiction to try the case on its merits. For example, in *Graham v. Illinois Racing Board* (1979), 76 Ill. 2d 566, 394 N.E.2d 1148, an owner of race horses brought an action to enjoin the Illinois Racing Board from proceeding with rule-violation hearings by utilizing challenged urine and blood specimens and tests. In discussing the availability of injunctive relief prior to exhaustion of the administrative remedy the court stated:

> "Previous decisions of this court hold that administrative remedies must be exhausted prior to seeking equitable relief except where an ordinance or statute is attacked as unconstitutional in its entirety, where multiple remedies exist before the same administrative agency and at least one has been exhausted, where irreparable harm will result from further pursuit of administrative remedies (*Illinois Bell Telephone Co. v. Allphin* (1975), 60 Ill. 2d 350, 358), or where it would be patently useless to seek relief before the administrative agency (*Northwestern University v. City of Evanston* (1978), 74 Ill. 2d 80, 88)." (76 Ill. 2d 566, 573, 394 N.E.2d 1148, 1151.)

The cases at bar are not in this category of proceeding since the circuit courts were not assuming jurisdiction to try the cases on their merits.

There are a large number of cases which stand for the proposition that courts cannot entertain complaints involving the subject matter and orders of administrative agencies until the administrative remedy is ex-

hausted. (*E.g., Graham v. Illinois Racing Board*; *Illinois Bell Telephone Co. v. Allphin* (1975), 60 Ill. 2d 350, 326 N.E.2d 737.) We are not confronted with an application of the exhaustion rule in the cases at bar, for no attack is made against any order of the administrative agency, and the parties and the agency are left free to pursue the administrative remedy as provided by the applicable statute. The preliminary injunctions served only to arrest the suspension of plaintiff's licenses by agents of the Board pending the conclusion of the administrative process.

Another instance of the interplay between courts and the administrative hearing process is that where the administrative agency has completed its hearing process and issued final orders adverse to a litigant. While the litigant is in the process of administrative review in the courts, the administrative agency, in order to protect the public health and welfare, and almost always pursuant to the authority of a special enforcement statute, will seek an injunction prohibiting continuation of activity or status, denied or withheld by final order of the agency, pending determination of judicial review. Cases illustrative of this action are *People ex rel. Director of Department of Children & Family Services v. Illinois Protestant Children's Home, Inc.* (1965), 33 Ill. 2d 60, 210 N.E.2d 217, and *People ex rel. Pollution Control Board v. Lloyd A. Fry Roofing Co.* (1972), 4 Ill. App. 3d 675, 281 N.E.2d 757. The difference between these cases and those we consider is readily apparent. Rather than instances of courts' intruding into the administrative hearing process, they are instances of administrative agencies, pursuant to statutory authority, seeking the power of injunction to prevent the time-consuming process of judicial review of administrative decisions from being used to thwart the immediate effect of the administrative ruling.

We also are not confronted here with an issue of judicial review of an administrative decision and its timeliness. Review is not sought. Preservation of the status quo pending the administrative determination is the ultimate reach of the proceedings.

When we turn our search to that for direct authority, we must admit that there is a dearth of it, at least in Illinois cases. Nevertheless, we believe a proper conclusion emerges from Illinois cases which consider associated issues, from cases of foreign jurisdictions and from general principles of equity jurisdiction and powers.

*Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, 25 N.E.2d 482, is a case that, though different in one important aspect, nevertheless furnishes some direction from our supreme court. From the procedural standpoint the *Slattery* case was concerned with the right of a utility to have resort to the circuit court for relief from allegedly confiscatory rates fixed by the Illinois Commerce Commission without having exhausted its administrative remedy. The supreme court observed that

jurisdiction cannot be taken away from the equity courts unless a statutory remedy is substituted which is adequate to prevent irreparable injury. This is because circuit courts of this State derive original jurisdiction in all equity cases from section 12 of article 6 of the constitution [1870], the legislature cannot validly limit those powers. At issue in the *Slattery* case, in the aspect bearing upon the issue in the case at bar, was the power of a court of chancery to prevent confiscation of property without due process of law by implementing temporary utility rates during the pendency of the administrative rate-making process prescribed by statute. Quoting from *Smith v. Illinois Bell Telephone Co.* (1926), 270 U.S. 587, 591-92, 70 L. Ed. 747, 749, 46 S. Ct. 408, 410, our supreme court stated:

> " 'Property may be as effectively taken by long continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them, and where, in that respect, such a state of facts is disclosed as we have here, the injured public service company is not required indefinitely to await a decision of the rate-making tribunal before applying to a Federal court for equitable relief.' " (373 Ill. 31, 45-46, 25 N.E.2d 482, 491.)

Concluding with respect to the power of a court of chancery to intervene in the administrative rate-making process the court in *Slattery* held:

> "[W]hen the legislative process of [temporary] rate-making is ended and the rate in force becomes confiscatory,—that is, results in the taking of property without process of law,—and either adequate means under the administrative provisions or the manner of administering such means is inadequate to prevent confiscation, then a court of equity has jurisdiction to remedy the wrong in an independent equity proceeding." 373 Ill. 31, 44, 25 N.E.2d 482, 490.

Although the *Slattery* case furnishes substantial precedent for resolution of the question in issue in the cases at bar, it yet is not precisely on point. In *Slattery* the circuit court issued the temporary injunction as a prelude, we should say as ancillary, to the exercise of its assumed jurisdiction to review the merits of the rate-making case *de novo* and not by way of administrative review. If the sought-after rate increases had been granted by the commission, the chancery action would have become moot and the temporary injunction would have served its purpose although the chancery court would make no determination on the merits. Nevertheless, a careful reading of *Slattery* furnishes justification for the statement that a court of chancery may issue a preliminary injunction to maintain the status quo pending the outcome of proceedings pending in another tribunal where such action is necessary to prevent irreparable harm or to prevent the moving party from being deprived of a valuable right without due process of law.

The *Slattery* case was followed in *Sprague v. Biggs* (1945), 390 Ill. 537, 62 N.E.2d 420, in a factually similar situation.

Another Illinois case that is of some precedential value is *City of Wheaton v. Chicago, Aurora & Elgin Ry. Co.* (1954), 3 Ill. App. 2d 29, 120 N.E.2d 370. There, defendant railroad was operating under the aegis of the Illinois Commerce Commission. Large portions of its facilities were condemned and other portions sold. Defendant proposed to distribute the money realized to its stockholders. Plaintiff cities were served by defendant railroad and were fearful that if the money defendant received for portions of its property were distributed to stockholders defendant would be unable to continue service to plaintiff communities. Plaintiffs filed a petition with the Illinois Commerce Commission to stay the distribution. One week later the plaintiffs sought and obtained a temporary injunction restraining defendant from distributing the property proceeds until further order of court. Defendant railroad appealed. Unfortunately, it does not appear from the court opinion whether or not the plaintiffs sought a temporary injunction only, but it does appear that they sought to maintain the status quo pending a determination on the merits of the question by the commission. The appellate court posited the principal question as whether the chancellor entered an order beyond the jurisdiction of a court of equity and thereby abused his discretion. It was found that the chancellor had abused his discretion, and the temporary injunction was dissolved. The court grounded its decision upon the fact that the plaintiffs had no property rights in the *res* and therefore the court of equity had no power to interfere with or attempt to supplement the administrative proceedings provided by statute. The wording of the opinion suggests that the result would have been different, and the issuance of the temporary injunction upheld, if the plaintiffs had had property rights that were about to be destroyed, and if the relief available from the commission pending its final determination were unable to furnish plaintiffs protection.

There are three Illinois Appellate Court cases which consider an associated issue and deserve consideration. In *Kulwin v. Harsh* (1924), 232 Ill. App. 419, the court upheld the issuance of an injunction and the appointment of a receiver by a circuit court where that relief was all that was requested. The relief granted was effective until determination of an appeal of a forcible entry and detainer action. In *Moroney v. Allman* (1933), 271 Ill. App. 336, the plaintiff was the holder of a cabaret license. When city officials refused to renew the license the plaintiff sought and obtained a writ of *mandamus* from the circuit court to compel renewal. The city appealed the granting of the writ. While the appeal was pending police officers harassed plaintiff's place of business and customers so that closure was imminent. Plaintiff thereupon obtained a temporary injunc-

tion prohibiting interference with his operations until the appeal of the order for *mandamus* was concluded. The appellate court sustained the issuance of the injunction. In *Chrysler Credit Corp. v. M.C.R. Leasing Co.* (1969), 114 Ill. App. 2d 43, 251 N.E.2d 648, the court sustained the issuance of a temporary injunction in a replevin action which would preserve books and records pending completion of the replevin case. The court relied upon *Kulwin v. Harsh*.

*Underground Electric Rys. Co. v. Owsley* (2d Cir. 1909), 176 F. 26, is a case where a Federal district court in New York appointed a receiver (for our purposes, the equivalent of the issuance of a preliminary injunction) to take charge of and preserve property of a decedent pending completion of probate proceedings in Illinois. The case contains an interesting discussion of some historical precedents for its action. It was stated that in England the court of chancery often appointed receivers to take charge of a decedent's estate until the ecclesiastical court should determine the rights of the parties. The appellant had argued in the *Owsley* case that the circuit court has no power to entertain a bill for the appointment of a receiver and nothing besides. The court answered:

"There is force in this contention. The appointment of a receiver is not the ultimate end and object of litigation, but is a provisional remedy or auxiliary proceeding. [Citations.] Still we think that this merely means that there must be litigation in some court to which the receivership is auxiliary, and does not necessarily require that it should be in the court of equity itself. In all the English and American cases referred to the probate proceedings to which the receiverships were incident were in a court distinct from the court of equity. Bills merely for the preservation of property pending litigation have repeatedly been sustained. In Williams on Executors (7th Ed.) p. 563, it is said:

'During a litigation in the ecclesiastical court for probate or administration, a court of equity would entertain a bill for the mere preservation of the property of the deceased till the litigation was determined and appoint a receiver, although the court of probate, by granting an administration pendente lite, might provide for the collection of the effects.'

It is true that in a suit merely for the appointment of a receiver the making of the appointment practically disposes of the matter in controversy. There is nothing more to be done except to surrender the property at the termination of the litigation to which the receivership is auxiliary. [Citations.] But this result while somewhat extraordinary constitutes no reason for denying the existence of a power so firmly established by the authorities. Of course, the

defendant is correct in the proposition that a court cannot create a receivership in a suit of which it has no jurisdiction. But this begs the question. In this case the court did have jurisdiction of the suit regarded merely as a suit for the preservation of imperiled property." 176 F. 26, 34-35.

In *Wood v. Braxton* (D.W. Va. 1892), 54 F. 1005, the court issued an injunction restraining the cutting of timber by one of the parties involved in title litigation which was then on appeal to the Supreme Court. The injunction was for the purpose of preservation of the property pending the outcome of the case in the Supreme Court.

"The jurisdiction of courts of equity by way of injunction to restrain waste, to prevent the cutting of timber, and the mining of minerals, is one of comparatively recent origin, but it is now fully recognized and well established in this country as well as in England.

* * *

The fact that the value of timber can be estimated, that it can be determined by the thousand feet, or by the car load, does not deprive a court of equity of the right to interfere by way of injunction, in cases where it is being cut and removed or destroyed, and where the ownership is in controversy." 54 F. 1005, 1008.

In *Babbitt v. Dutcher* (1910), 216 U.S. 102, 54 L. Ed. 402, 30 S. Ct. 372, the Supreme Court affirmed the issuance of a mandatory injunction by a United States District court in New York in aid of bankruptcy proceedings pending in a United States District Court in Missouri. They found, "There is no decision of this court adverse to the ancillary jurisdiction of the District Courts as asked to be exercised in this case." 216 U.S. 102, 114, 54 L. Ed. 402, 407, 30 S. Ct. 372, 377.

In *Edmonds v. Hall* (1952), 236 N.C. 153, 72 S.E.2d 221, a temporary restraining order and continued temporary restraining order were entered which restrained obstruction of an alleged permissive roadway pending the outcome of a statutory proceeding before the clerk of the superior court. The Supreme Court of North Carolina sustained the issuance of the temporary restraining order but remanded for further hearings as to its continuance. In its decision the court stated, "[A] court of equity, or a court in the exercise of its equity powers, may use the writ of injunction as a remedy subsidiary to and in aid of another action or special proceeding." 236 N.C. 153, 156, 72 S.E.2d 221, 223.

We have found considerable guidance and insight in a treatise by Professor Jaffe, Judicial Control of Administrative Action (1965). In chapter 17 of his work Professor Jaffe discusses temporary judicial stays pending administrative action. Part I of that chapter is devoted to a discussion of temporary judicial stays pending court proceedings in the

nature of judicial review. In such situations the traditional chancery powers of courts may be brought to bear to suspend the effect of administrative action until judicial review is completed. But traditional chancery powers are not the sole source of authority for courts to act in such situations. Statutory authorization for judicial review of administrative decisions generally make provision for stay of the effect of the administrative decision pending court determination. In Illinois, section 12(1)(a) of the Administrative Review Act (Ill. Rev. Stat. 1977, ch. 110, par. 275(1)(a)) provides that the circuit court shall have power, upon conditions stated, to stay the decision of the administrative agency in whole or in part pending the final disposition of the case.

Part II of chapter 17 of the Jaffe treatise is devoted to preservation of the status quo pending decisions by administrative tribunals. Initial consideration is given to temporary injunctive relief granted under statutory authority, which is a circumstance not pertinent to our cases. He next considers temporary injunctive relief in the absence of statutory authority, which is the circumstance pertinent to our case.

Professor Jaffe cites the following from *Evans v. International Typographical Union* (S.D. Ind. 1948), 76 F. Supp. 881, 884:

> "The authority of courts of equity to grant interlocutory relief pending a final adjudication is of ancient origin and needs no support of cited authority. The application for such interlocutory relief need not be confined to the tribunal to which the final determination of the principal issues is committed."

He then observes that "this rather sweeping dictum has not always been borne out by the cases in which federal courts have been asked, without benefit of specific statutory authorization, to preserve the status quo pending determination by federal administrative agencies." Several federal cases are reviewed. Of particular interest to our issue were those concerned with stay of administrative review. By the analysis presented it was shown that there was both mistaken interpretation and misapprehension of the issues, with the result that no clear rule had been defined or followed. The author, however, was not obfuscated in his thinking, as evidenced by the following, one of his closing paragraphs:

> "If there has been a question whether the courts have a power to maintain the status quo pending an administrative proceeding, it would seem that there is by this time sufficient authority to establish the existence of such a power. The doubt has arisen because arguably the failure of the legislature to confer the power on agency or court may imply its negation, particularly in the absence of a firmly established judicial power. But our courts, after their initial hesitations, have been willing to draw upon their historic

reservoir of procedural devices, particularly those associated with equity, for the effectuation of legally mandated purposes. In each case it is the statute creating the agency which establishes the substantive goals. The statute to be sure sets up procedures, but it is understood that these procedures are projected against the institutional framework of agencies and courts. At the outset of this chapter, we have shown that the traditions of law and equity, the judicial code and practice under it, offer a firm ground for the use of the preliminary injunction, not only to further the jurisdictional purposes of the granting court, but to aid other jurisdictions as well. These other jurisdictions have ordinarily been courts, but there would appear to be no reason why it is not equally appropriate to use the injunction to further the purposes assigned to agencies. Indeed, there is the further reason for its use that the failure to confer such a power on a particular agency itself may reflect the feeling that the agency is in some sense a party, and the power should be exercised by a more disinterested tribunal."

In some more recent Federal cases the issue was better identified and considered, and a more concise formulation of principle may be discerned.

In *Nor-Am Agricultural Products, Inc. v. Hardin* (7th Cir. 1970), 435 F.2d 1151, the Secretary of Agriculture wrote a letter to the plaintiff suspending the registration as an economic poison of a mercury compound used as an anti-fungal treatment for agricultural seeds. Plaintiff initiated administrative review of the suspension order and also sought and obtained a preliminary injunction which enjoined implementation of the suspension order pending the administrative determination. As authority for the preliminary injunction the district court relied on certain procedural statutes and "general equity powers of this court." A three-judge panel of the Circuit Court of Appeals upheld the preliminary injunction but upon rehearing *en banc* the issuance of the preliminary injunction was reversed. The reason for the reversal was that the plaintiff had not exhausted its administrative remedy. The opinion mentioned "judicial review" of the preliminary decision of the Secretary, and the court was obviously concerned with the esoteric knowledge required to deal meaningfully with the dangers inherent in a mercury-compound poison. Plaintiff urged that equity powers of the court were properly invoked to prevent irreparable injury. The court answered that the circumvention of clearly proscribed administrative procedures by awarding equitable relief is an exceptional practice. Thus, the court was confronted with the issue we have in the cases we consider here and gave plain acknowledgement of the rule in the following language:

"As explained in Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 773-774, 67 S. Ct. 1493, 1503-1504, 91 L. Ed. 1796, the rule that administrative remedies may occasionally be by-passed to protect strong private interests from irreparable harm

'is not one of mere convenience or ready application. Where the intent of Congress is clear to require administrative determination, either to the exclusion of judicial action or in advance of it, a strong showing is required, both of inadequacy of the prescribed procedure and of impending harm, to permit shortcircuiting the administrative process. Congress' commands for judicial restraint in this respect are not lightly to be disregarded.' " (435 F. 2d 1151, 1159-60.)

The court then simply found that plaintiffs had failed to establish such an irremedial threat as to warrant equitable intervention.

There was a dissent in the *Nor-Am* case which succinctly points to the overriding issues in our cases.

"The crucial and basic question here involved, however, in my opinion, is whether judicial intervention is permissible in the event of arbitrary and capricious administrative action. I do not find in the present majority opinion confrontation with this issue.

\* \* \*

The result for which I contend in this dissenting opinion, which was the result reached in the opinion of July 15, 1970, would not have stopped administrative procedures on the issue of whether Panogen should eventually be removed from the market. The opinion carefully pointed out that the decision would permit a rational and objective administrative procedure to go forward, giving due weight to all phases of the matter, including that which is probably of long range concern to the government, the ecological aspects. The opinion made it possible for the determination to be made with a thorough airing of the adequate determining principles. United States v. Carmack, 329 U.S. 230, 243, 67 S. Ct. 252, 91 L. Ed. 209 (1946)." 435 F.2d 1151, 1161, 1166.

The *Nor-Am* case, and its dissent, constitute a graphic illustration of the issue, the rule and the concerns with which courts may be confronted in applying the rule.

In *Environmental Defense Fund, Inc. v. Ruckelshaus* (D.C. Cir. 1971), 439 F.2d 584, the court reviewed a decision of the Secretary of Agriculture to deny a request for suspension of registration of pesticides pending completion of administrative hearings that would determine whether the registrations would be cancelled. The court disagreed with the sum of the conclusions of the court in the *Nor-Am* case, stating: "In our view, a suspension order, like an order denying suspension, is subject

to judicial review in a proper case." (439 F.2d 587, 592.) The case was remanded with directions to the Secretary for a fresh determination on the issue of suspension, identification of the factors considered and a statement of the reasons considered.

The significance of the *Ruckleshaus* case for the cases at bar is the fact that the court had intervened in the administrative decision-making process and would, if circumstances were found to warrant it, intervene with orders to compel or stay the effects of provisional administrative decisions pending the final administrative decision. The court spoke in terms of "judicial review," but it is obvious that such review would be limited to the provisional administrative decision.

Consideration of another aspect of the issue is furnished by *PAX Co. v. United States* (10th Cir. 1972), 454 F.2d 93. There, petitioner was a manufacturer of chemical weed and pest killers. The government had instituted administrative proceedings that could have resulted in cancellation of the registration of the compounds involved. There was no suspension of registration pending the administrative proceedings, which at the time of the court's opinion had consumed four years and were not yet concluded. All the while the petitioner company had continued the manufacture and sale of the compounds. The district court issued an injunction which blocked the administrative proceedings. The Circuit Court of Appeals reversed because there was no threat of immediate harm or deprivation to petitioner, and the process of administrative hearing and judicial review of administrative determination furnished an adequate remedy.

The *PAX* case was easy on its facts; there were no equities presented which would justify provisional relief of a court of chancery. However, the court did discuss the issues of consequence in our cases by stating:

> "The decision as to when, if at all, courts should interfere in the administrative process is itself a difficult one. A leading treatise on this subject has said that sometimes exhaustion of administrative proceedings is necessary and sometimes it is not. 3 Davis, Administrative Law Treatise, c. 20 (1958)." (454 F.2d 93, 96.)

The *PAX* court acknowledged that extensive and actual harm that would follow from a provisional administrative ruling would justify judicial intervention. They quoted the following from the Supreme Court case of *Columbia Broadcasting System v. United States* (1942), 316 U.S. 407, 86 L. Ed. 1563, 62 S. Ct. 1194:

> "The ultimate test of reviewability is not to be found in an over-refined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in

advance of other hearings and adjudications that may follow, the results of which the regulations purport to control. (316 U.S. at 425, 62 S. Ct. at 1204)." 454 F.2d 93, 96-97.

A case of similar facts and reasoning to *PAX* is *Dow Chemical Co. v. Ruckelshaus* (8th Cir. 1973), 477 F.2d 1317, in which the court concluded:

"We have before us no mistaken interpretation of the law by the Administrator, no failure of duty by the Administrator, there is abundant administrative remedy, and there is no irreparable injury to Dow. In fact, any injury to Dow (as in the *Pax* case, *supra*) is at the most indirect for, under the law, the cancellation orders have no effect on Dow's right to ship and market its product until the administrative cancellation process has been completed and the ultimate decision may not be adverse." (477 F.2d 1317, 1326.)

Of interest regarding the reasoning process and equities considered in deciding upon provisional judicial intervention is the following:

"We here consider a recent and largely untested act, not without its ambiguities. We consider, as well, matters 'as sensitive and fright-laden as cancer' and birth defects. It is a situation of extreme complexity, interweaving economic pressures with the most basic considerations of human safety. In this situation the Act, wisely we think, contemplates no interlocutory judicial jousting which experience has taught us can go on for years. It was the intent of the Congress that matters under the Act proceed expeditiously to a final order subject to judicial review and without judicial intervention prior thereto. Such is our ruling. We have, as yet, no final order within the contemplation of the Act." 477 F.2d 1317, 1326.

Although instances where the precise issue presented are few, they are nonetheless available. As might be supposed, there is not unanimity of opinion, and reasons for and against application of temporary injunctive power in the situations we consider veer this way and that because of the intervention of various factors as, for instance, statutory provisions and application of the rule that administrative remedies must be exhausted before a court may intervene. Nevertheless, one may not deny that a rule has emerged which recognizes that when the proper circumstances are presented it, a court exercising traditional and inherent chancery powers may intervene in the administrative process by furnishing the provisional relief of a preliminary injunction which will serve to maintain the status quo pending the completion of the administrative hearing processes and rendition of the final order of the administrative agency. The factors that justify such intervention by a court exercising chancery powers cannot be readily delineated or categorized. It is perhaps best that no attempt be made to create or delineate the particular instances when such intervention is justified. It is best in this instance, as with most instances of action

by courts exercising chancery powers, to say that the decision whether to intervene by preliminary injunction lies within the sound discretion of the court and that that discretion encompasses consideration of the peculiar facts of each case, the traditional powers of courts of chancery, precedent, matters of public policy and public concern, and statutes. Matters of principal concern will generally involve the availability of adequate alternative relief, the necessity to prevent irreparable injury or irretrievable loss and the deprivation of some constitutional right without due process of law.

■■ We affirm the issuance of the temporary restraining orders and preliminary injunctions in each of the cases we consider.

The second issue we address considers whether plaintiffs were deprived of due process of law when their licenses were suspended by the stewards pending a hearing by the Board.

The procedure to suspend and revoke horse-racing-related occupational licenses is contained in section 16 of the Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1977, ch. 8, par. 37—16). Subsection (a) provides that the Board shall have the power to revoke or suspend an occupational license and the steward or judges at a race meeting shall have the power to suspend an occupational license subject to the procedures outlined in subsections (b) through (e) of section 16. Subsection (b) provides that if the Board refuses, revokes or suspends or a steward or the judges at any race meeting suspend an occupational license, the occupational license of the person concerned shall be suspended pending a hearing of the Board. Subsection (c) provides that the licensee affected by the suspension of subsection (b) may request a hearing within 5 days after receipt of notice of suspension and that a hearing shall be held by the Board within 7 days after receipt of the request. Subsection (d) makes provision for the place of hearing by the Board and the manner of giving notice. Subsection (e) sets out basic guidelines for conduct of the hearing before the Board and permits any affected party to be represented by counsel and introduce evidence.

The statutory scheme contemplates a two-stage procedure for suspension or revocation of an occupational license with two approaches to suspension or revocation. The two stages leading to suspension or revocation are interim action and final action. The two approaches are that the action may be initiated either by the Board or by a steward or the judges at a race meeting. The final action of suspension or revocation must be by the Board following notice, hearing, opportunity to present evidence and the representation of counsel, all as provided by subsection (c). There can be no question but that the subsection (e) hearing which culminated in the final action upon suspension or revocation comports in all respects with the requirements for procedural due process.

Closer scrutiny is required when due process consideration is given to the matter of interim suspension or revocation of an occupational license. Subsection (a) of section 16 of the Act provides that the Board may revoke or suspend an occupational license, and that a steward or the judges at a race meeting may only suspend an occupational license. Subsection (b) provides that any revocation or suspension made pursuant to subsection (a) shall be interim in nature, effective only pending the full hearing by the Board as provided in subsection (e).

It is suspension pursuant to subsection (a) that concerns us in the cases at bar. It is to be noted that the statute which authorizes the interim suspension or revocation does not provide any sort of notice or opportunity to be heard prior to the imposition of the suspension or revocation. We have examined the Rules and Regulations of Horse Racing and the Rules and Regulations of Harness Racing adopted by the Board. Nowhere in those rules and regulations is any provision made for notice and hearing prior to an interim suspension or revocation pursuant to subsection (a) of section 16 of the Act. Much in the same tenor, neither the Horse Racing Act nor the Rules and Regulations of the Board make any provision for a licensee whose license has been suspended by a steward to seek to obtain from the Board any stay that will delay the impact of the stewards' action until such time as the Board has completed its formal hearing on the matter and rendered its administrative decision.

The absence of any requirement for notice and hearing prior to interim suspension or revocation is seemingly a violation of procedural due process, for the net result is that the holder of an occupational license that has been revoked or suspended on an interim basis must suffer the imposition of a penalty before he has ever had notice or a chance to be heard. It should be noted that in the instance of each of the cases under consideration the stewards did give some sort of notice that a suspension of license was being considered. We need not detail the individual circumstances attending the hearings, but suffice it to say that the "hearings" were either nonexistent or the most summary in nature. This circumstance spawned the preliminary injunctions in the cases at bar. In each case the plaintiff as holder of an occupational license alleged that he was being summarily penalized, being deprived of his livelihood and suffering irreparable damage prior to the time that his case was to be heard. It was further variously asserted that by the time a hearing could be held as provided in subsection (e) the loss or detriment suffered would be irretrievable. Under these circumstances we have held today the preliminary injunctions to have been properly issued pending hearings on the merits by the Board.

Although we have found that the issuance of preliminary injunctions was justified in these cases, it readily can be seen that cases may arise

under section 16 of the Act in which intervention by a court exercising chancery powers will not be justified. But even with or without consideration of equitable intervention, whether section 16(a) of the Act can pass due process muster is and must be a separate consideration. It is in such light that we consider it.

■■ The United States Supreme Court has emphasized that due process of law, at a minimum, prohibits the deprivation of property without providing notice and an opportunity for a hearing appropriate to the nature of the case. (*Memphis Light, Gas & Water Division v. Craft* (1978), 436 U.S. 1, 56 L. Ed. 2d 30, 98 S. Ct. 1554; *Mullane v. Central Hanover Bank & Trust Co.* (1950), 339 U.S. 306, 94 L. Ed. 865, 70 S. Ct. 652; *cf. Wilson v. Bishop* (1980), 82 Ill. 2d 364.) The timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved. *Goss v. Lopez* (1975), 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729; *Wilson v. Bishop*.

In *Dixon v. Love* (1977), 431 U.S. 105, 52 L. Ed. 2d 172, 97 S. Ct. 1723, the Supreme Court had occasion to discuss the due process implications of an Illinois statute which authorized the suspension or revocation of the license of a driver who repeatedly had been convicted of traffic offenses. The statute and administrative regulations provided for an initial summary decision based on official records, with a full administrative hearing available only after the suspension or revocation had taken effect. Thus, the procedure for suspension or revocation in *Dixon v. Love* is similar to that provided by section 16 of the Horse Racing Act of 1975. In the *Dixon* case the Supreme Court observed:

"It is equally clear that a licensee in Illinois eventually can obtain all the safeguards procedural due process could be thought to require before a discretionary suspension or revocation becomes final. Appellee does not challenge the adequacy of the administrative hearing, noted above, available under §2—118. The only question is one of timing. This case thus presents an issue similar to that considered only last Term in *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976), namely, 'the extent to which due process requires an evidentiary hearing prior to the deprivation of some type of property interest even if such a hearing is provided thereafter.' We may analyze the present case, too, in terms of the factors considered in *Eldridge*:

'[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional or substitute procedural safeguards; and

finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " (431 U.S. 105, 112-13, 52 L. Ed. 2d 172, 180, 97 S. Ct. 1723, 1727.)

In concluding, in *Dixon v. Love* the court found that the public interests present were sufficiently visible and weighty for the State to make its summary initial decision effective without a predecision administrative hearing. The case may be considered as an illustration of the fact that procedural due process in the administrative setting does not always require application of the judicial model.

The same due process theme applied in a different context is to be found in *Memphis Light, Gas & Water Division v. Craft, Matthews v. Eldridge,* and *Bell v. Burson* (1971), 402 U.S. 535, 29 L. Ed. 2d 90, 91 S. Ct. 1586.

■■ Illinois recognizes that a license to do business, including an occupational license conferred by the Illinois Racing Board, constitutes a property interest that is entitled to due process protection. (*Pozner v. Mauck* (1978), 73 Ill. 2d 250, 383 N.E.2d 203; *Burden v. Hoover* (1956), 9 Ill. 2d 114, 137 N.E.2d 59.) In making a determination whether the holder of a license has been deprived of due process in an instance of suspension or revocation, the approach of the Illinois Supreme Court has been the same weighing and balancing process followed by the United States Supreme Court. For instance, in *Rios v. Jones* (1976), 63 Ill. 2d 488, 497, 348 N.E.2d 825, 829, the court said:

> "The fact that the plaintiffs possess property rights and are entitled to due process protection, however, does not mean that those rights cannot be affected by State legislation. As the United States Supreme Court declared in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 44 L. Ed. 2d 572, 588, 95 S. Ct. 2004, 2016: '[T]he States have a compelling interest in the practice of professions within their boundaries, and * * * as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions.' The demands of due process are proportional to the weight of the interest being protected in balancing that interest against the countervailing interests of society. (*Powell v. Jones*, 56 Ill. 2d 70, 78,) If, after balancing these interests, the State's exercise of its police power is deemed to be reasonable, the legislation in questions must be upheld."

In *Powell v. Jones* (1973), 56 Ill. 2d 70, 305 N.E.2d 166, in answer to plaintiffs' contention that certified State employees have a legitimate claim of entitlement to continued employment that is safeguarded by due

process, the court tempered the claim for a general application of due process as an absolute protection with the following:

"That fact [of due process protection of certified employment status], however, is not in our judgment dispositive of the case, for the requirements of due process are necessarily proportional to the weight of that interest in balancing it against the countervailing interests of society in effective and efficient governmental operation." (56 Ill. 2d 70, 78, 305 N.E.2d 166, 170.)

See also *Pozner v. Mauck*.

■■ Proceeding with weighing and balancing of the factors involved, as required by the foregoing cases, we conclude that the public interest in preserving the integrity and honesty of the horse racing and harness racing industry outweighs any inconvenience or detriment to the holders of race-track-related occupational licenses which may arise from summary interim suspension of licenses pending a full hearing before the Board.

Many factors bear on our decision in favor of the statutory scheme, but we will mention only a few. Perhaps the most important is the very difficult task faced by the Board and other concerned officials in overseeing and regulating horse racing and harness racing to the end that races are conducted with honesty and integrity. That conclusion does not come from evidence in a record before us. It springs from the notorious fact that efforts to arrange predetermined results of races, to "fix" them, as it were, are an ever present and persistent part of horse racing. The temptations for such activity are many and are equalled only by the opportunities. The regulatory task is difficult at best. It is necessary, and we think reasonable, that the Board and its agents have the power of summary suspension to use as a tool in the investigative, decisional and enforcement process. The interest of the State in protecting the purity of the sport of horse racing and harness racing is weighty, not the least of which is the pecuniary interest stemming from the income from parimutuel wagering.

In contravention to the interests of the State are the interests of the occupational license holders and the procedural treatment they are accorded by the statutory scheme for suspension and revocation. It must be recognized that the private interests present in these cases involving occupational licenses are important to their holders. At a minimum, the licenses frequently represent the only livelihood of their holders. These rights of the licensees are not to be lightly swept away by a summary and arbitrary action unless the countervailing interests of the State are weighty and persuasive. In this vein we think the relevant statute gives recognition to the importance with which the licenseholder regards his license. This concern is reflected in the brevity of the initial suspension, which may be imposed without a full due process hearing. Section 16(c) of the Act

provides that a person affected by a license suspension or revocation may request a hearing before the Board within five days and that the hearing shall be held within seven days after the request.

Upon consideration of the foregoing factors, we have concluded that none of the licensees were deprived of due process of law by the interim suspensions made by the stewards.

Affirmed.

KASSERMAN, P. J., and HARRISON, J., concur.