THE CITY OF SPRINGFIELD *et al.*, Plaintiffs-Appellants, *v.* ROBERT H. ALLPHIN, Director of the Department of Revenue, *et al.*, Defendants.— (ROBERT H. ALLPHIN, Appellee.)

Fourth District No. 13894

Opinion filed July 5, 1977.

D. Bradley Blodgett, of City Legal Department, and Thomas W. Kelty, both of Springfield, for appellants.

Thomas R. Meites, of Chicago, for appellee.

Mr. PRESIDING JUSTICE GREEN delivered the opinion of the court:

Plaintiffs, the city of Springfield and the Illinois Municipal League, appeal from an order of the Circuit Court of Sangamon County entering a declaratory judgment upon one count of plaintiffs' amended complaint

adverse to plaintiffs' contentions and dismissing the balance of the complaint for failure to state a cause of action.

Sections 8—11—1 and 8—11—5 of the Illinois Municipal Code (Ill. Rev. Stat. 1975, ch. 24, pars. 8—11—1 and 8—11—5) authorize municipalities to impose a municipal retailers' occupation tax and a municipal service occupation tax. The Department of Revenue collects those taxes for the municipalities and retains a percentage of the taxes as a service charge to cover administrative costs. The legislation in question, Public Act 78—1255, amended those sections to reduce the service charge from 4% to 2% of the taxes collected.

The bill passed by the General Assembly did not provide for an effective date. The Department of Revenue maintained that the bill did not become effective until July 1, 1975, and continued to retain a 4% service charge for taxes collected. Plaintiffs, the city of Springfield and the Illinois Municipal League, filed suit in the Circuit Court of Sangamon County. Count I of their amended complaint requested a declaratory judgment that Public Act 78—1255 became effective on December 5, 1974, and counts II through IV asked that the court order defendants to refund the excess service charge. After hearing arguments of counsel upon defendant's motion to dismiss, the court entered judgment declaring the effective date of Public Act 78—1255 to be July 1, 1975, and dismissing counts II through IV for failure to state a cause of action. Plaintiffs appeal.

Public Act 78—1255 was introduced in the Senate as Senate Bill 265. On May 29, 1974, the Senate concurred in the House amendment and the bill was sent to the Governor. He vetoed the bill on July 26, 1974, and returned it to the General Assembly. On November 21, 1974, the Senate overrode the veto by the required three-fifths vote, and the House did the same on December 5, 1974.

Article IV, section 10, of the Illinois Constitution of 1970 states:

"The General Assembly shall provide by law for a uniform effective date for laws passed prior to July 1 of a calendar year. The General Assembly may provide for a different effective date in any law passed prior to July 1. A bill passed after June 30 shall not become effective prior to July 1 of the next calendar year unless the General Assembly by the vote of three-fifths of the members elected to each house provides for an earlier effective date."

Pursuant to that mandate, the General Assembly enacted "An Act in relation to the effective date of laws" (Ill. Rev. Stat. 1973, ch. 131, par. 21 et seq.). Section 1(a) of that act provides:

(a) "A bill passed prior to July 1 of a calendar year that does not provide for an effective date in the terms of the bill shall become effective on October 1 of that year if October 1 is the same as or

subsequent to the date the bill becomes a law; provided that if October 1 is prior to the date the bill becomes a law then the date the bill becomes a law shall be the effective date."

The date of passage, then, determines whether a bill containing no effective date becomes effective on July 1 of the following year or at some earlier date. Plaintiffs contend that Senate Bill 265 "passed" on May 29, 1974, the date the bill passed both houses for the first time. According to this argument, the bill passed prior to July 1 so the effective date would be December 5, 1974, the date the bill became law. Defendant concedes that if the bill passed prior to July 1, the effective date would be December 5, 1974. However, defendant contends that the bill did not pass until both houses voted to override the Governor's veto. Since that occurred after June 30, defendant maintains that the bill could not become effective until July 1 of the following year.

In *Board of Education v. Morgan* (1925), 316 Ill. 143, 147 N.E. 34, the supreme court was asked to determine the effective date of an act passed by the General Assembly on June 19, 1923, and approved by the Governor on July 2, 1923. At that time, section 13 of article IV of the Illinois Constitution of 1870 outlined the procedures to be followed by the legislature after a bill was introduced. It also included the following provision concerning the effective date of laws: "And no act of the General Assembly shall take effect until the first day of July next after its passage* * *." (Ill. Const. 1870, art. IV, sec. 13.) The court held that the term "passage" referred to the legislative action outlined in section 13 and did not include approval of the bill by the Governor. Therefore, the bill was passed prior to July 1 and could become effective when signed by the Governor rather than on July 1 of the next year.

■■ In a recent case, the supreme court stated that it would continue to follow the definition stated in *Morgan*.

"Read as a whole, the opinion in *Morgan* defines the time when a bill is passed as the time of the last legislative act necessary so that the bill would become law upon its acceptance by the Governor without further action by the legislature. We continue to adhere to this definition." (*People ex rel. Klinger v. Howlett* (1972), 50 Ill. 2d 242, 247, 278 N.E.2d 84, 87.

In the Illinois Constitution of 1970, sections 8, 9(a) and 10 of article IV would govern a situation similar to that in *Morgan* where the Governor approved a bill after its initial passage by the legislature. The instant case, however, involved a different set of circumstances. Here, the Governor vetoed the bill and the General Assembly voted to override that veto pursuant to section 9(c) of article IV. Section 9(c) uses the term "passes" to describe the action of the legislature in voting to override the veto. The

question is whether that term has the same definition as the terms "passage" and "passed" used in sections 8, 9(a) and 10.

■■ Shortly before plaintiffs filed suit in this action, the Attorney General issued an opinion (No. S—890) concerning the effective date of a bill with a legislative history nearly identical to that of Public Act 78—1255. In that opinion, the Attorney General stated that the term "passes" in section 9(c) is used in a different sense than that in which the terms "passage" and "passes" are used in sections 8, 9(a) and 10. An opinion of the Attorney General is not binding on the courts. However, the reasoning in an opinion may be given considerable weight, especially in a matter of first impression in the courts of this State (*Alsen v. Stoner* (1969), 114 Ill. App. 2d 216, 222, 252 N.E.2d 488, 491; *Strat-O-Seal Manufacturing Co. v. Scott* (1966), 72 Ill. App. 2d 480, 484-485, 218 N.E.2d 227, 229). We find the Attorney General's opinion on this question to be well-reasoned and persuasive.

■■ A cardinal rule of statutory and constitutional construction is that where a word has been used more than once in an instrument, it is presumed to have been used with the same meaning throughout, unless a contrary legislative intent is clearly expressed. (*Chapman v. County of Will* (1973), 55 Ill. 2d 524, 529-530, 304 N.E.2d 287, 290.) A good argument can be made that the term "passes" used in section 9(c) does not have the same definition as the terms "passage" and "passed" used in sections 8, 9(a) and 10. The override procedure can be distinguished from the procedures outlined in section 8 which deal with the initial consideration and passage of a bill by the legislature. Unlike the legislative actions described in section 8, the action of the legislature in voting to override a veto culminates in the bill becoming law. This can be viewed as an alternative to the methods whereby a bill becomes law by the Governor's signature or by the lapse of 60 days after presentation to the Governor. As such, it is no more an element of final "passage" than the Governor's signature, which in *Morgan* was expressly held not to be a part of final passage. Therefore, we conclude that the action of the legislature in overriding the Governor's veto is not part of the "passage" of a bill, as that term is used in section 10. For purposes of determining an effective date, Public Act 78—1255 "passed" on May 29, 1974, the date the bill passed both houses prior to its delivery to the Governor. Since the bill "passed" prior to July 1, it became effective on December 5, 1974, the date the bill became law.

Defendant contends that the supreme court decision in *People ex rel. Klinger v. Howlett* (1972), 50 Ill. 2d 242, 278 N.E.2d 84, established that the date of passage after the Governor's veto controls the determination of the effective date of the bill. We disagree. We do not believe the

decision in *Klinger* established such a broad rule. In *Klinger*, the supreme court considered the question of the effective date of a bill which had originally passed prior to July 1 and did not contain an effective date. In September, the Governor returned the bill with extensive recommendations, stating that he was acting pursuant to his amendatory veto power under section 9(e). In October, the General Assembly accepted the Governor's recommendations and sent the bill back to the Governor, who certified that the changes conformed to his recommendations. The supreme court held that for purposes of determining an effective date, the bill "passed" when the General Assembly voted to accept the Governor's recommendations. The court stated, "Any other definition of the word 'passed' which fixed an earlier time would require this court to rule that the bills were passed before the legislature ever considered them in their final form, indeed before they were written." 50 Ill. 2d 242, 248, 278 N.E.2d 84, 87.

We do not believe the court's reasoning in *Klinger* is applicable to the instant case. In *Klinger*, the court stressed the fact that a bill could not be considered "passed" before it was in final form. When the Governor exercises his amendatory veto power, and the General Assembly votes to accept those changes recommended by the Governor, the resulting legislation is no longer the same bill as that which initially passed under article IV, section 8, prior to initial delivery to the Governor. In contrast, when the legislature votes to override a veto, it is not enacting substantive changes in the bill, but rather is reaffirming the identical language previously considered.

Furthermore, the court in *Klinger* defined "passage" as "the time of the last legislative act necessary so that the bill will become law upon its acceptance by the Governor without further action of the legislature." With an amendatory veto, the bill must be resubmitted to the Governor for certification if the General Assembly votes to accept his recommendations. Therefore, that vote is the last legislative action so that the bill becomes law upon acceptance by the Governor. In contrast, a vote to override a veto cannot be legislative action *prior to* acceptance by the Governor because the bill becomes law if the General Assembly votes to override a veto and the bill is never presented to the Governor after such a vote.

Therefore, we do not believe the decision in *Klinger* established the rule that any legislative action after a veto constituted "passage" of the bill. If the supreme court had intended such a broad ruling, it need not have discussed the particular aspects of a vote to accept the recommended changes after an amendatory veto, such as the requirement that the bill be resubmitted to the Governor for certification

and the fact that the General Assembly had not previously considered the bill in its final form.

In counts II through IV of their amended complaint, plaintiffs asked the trial court to order defendant to create a "protest fund" using the service charge on current tax receipts and to refund the excess service charge out of that fund. Defendant argues (1) that the trial court lacked jurisdiction to hear the case, and (2) that the contested service charges have already been deposited in the general revenue fund and cannot be refunded from the service charges on taxes currently collected.

■■ First, we note that the issue here is not a question of the jurisdiction of the trial court. Section 9 of article VI of the Illinois Constitution of 1970 gives the circuit courts original jurisdiction over all justiciable matters except when the supreme court has original and exclusive jurisdiction relating to redistricting of the General Assembly and the ability of the Governor to serve or resume office. Instead, the issue concerns sovereign immunity. Article XIII, section 4, of the Illinois Constitution of 1970 abolished sovereign immunity except as provided by the General Assembly. In response to that provision, the General Assembly enacted a statute (Ill. Rev. Stat. 1975, ch. 127, par. 801) which prevents the State of Illinois from being made a defendant or party in any court except as provided in the court of Claims Act. (Ill. Rev. Stat. 1975, ch. 37, par. 439.1 *et seq.*). That statute, however, does not bar this action because the State of Illinois is not considered a party when suit is brought against a State officer who is alleged to be enforcing an unconstitutional statute or proceeding in violation of law (*Moline Tool Co. v. Department of Revenue* (1951), 410 Ill. 35, 101 N.E.2d 71; *County of Cook v. Ogilvie* (1972), 50 Ill. 2d 379, 383, 280 N.E.2d 224, 226).

Defendant also contends that the excess service charge cannot be refunded because those funds have already been deposited in the general revenue fund. Defendant argues that a person claiming tax monies collected by the Department of Revenue must take the proper steps to assure that those particular funds are segregated from the general revenue fund. Defendant contends that a claim for tax monies is linked to the particular funds in question so that a person cannot claim a setoff against subsequently collected taxes. To support his argument, defendant cites *Montgomery Ward & Co. v. Stratton* (1930), 342 Ill. 472, 174 N.E. 547.

In *Montgomery Ward,* the plaintiff had paid a franchise tax of $55,701 under protest but had not completed the procedures necessary to enforce his claim, so pursuant to statute, the tax money was deposited in the State treasury. A year later, an additional tax of $19,971 was validly assessed against plaintiff. Plaintiff paid that amount under protest and filed suit contesting the validity of the first assessment and asking the court to order

defendant to retain the $19,971 so that amount would be available to make a partial refund of the $55,701 which plaintiff claimed had been incorrectly assessed. The supreme court held that plaintiff could not use subsequent tax monies to obtain a refund of prior tax payments which had already been deposited in the State treasury. The court noted that there was a statutory procedure for establishing a protest fund if a taxpayer wished to contest the validity of an assessment and that plaintiff had not followed that procedure.

We do not believe that the ruling in *Montgomery Ward* is applicable to the instant case. The Municipal Retailers' Occupation Tax Act and the Municipal Service Occupation Tax Act (Ill. Rev. Stat. 1975, ch. 24, pars. 8—11—1 and 8—11—5) authorize municipalities to impose those taxes and provide that the Department of Revenue shall administer and enforce those acts for the benefit of the municipalities. The statutes provide that the Department of Revenue shall "pay over to the State Treasurer, ex-officio, as trustee, all taxes and penalties collected hereunder." Plaintiffs in this case are not taxpayers but rather are the beneficial recipients of the tax monies and penalties by the State Treasurer for their benefit. The monies transferred by the State Treasurer into the general revenue fund are not taxes collected for state purposes but are a service charge designed to reimburse the trustee for services rendered.

There are no statutory procedures by which plaintiffs in this case can protest the amounts improperly retained by the Department as a service charge. Equity requires, however, that a trustee who has received excess reimbursement in the past, forgo future reimbursement until the accounts are even. Such a procedure is consistent with the provisions for adjustments found in these two tax acts. Sections 8—11—1 and 8—11—5 authorize the Department of Revenue to make refunds and issue credit memoranda to taxpayers in the event of erroneous payments of taxes or penalties. The statutes then provide that the amount of any credit memoranda or refunds made to taxpayers shall be deducted from future disbursements to the municipalities. "The amount to be paid to each municipality shall be the amount (not including credit memoranda) collected hereunder during the second preceding calendar month by the Department, and not including an amount equal to the amount of refunds made during the second preceding calendar month by the Department on behalf of such municipality * * *." Ill. Rev. Stat. 1975, ch. 24, par. 8—11—1.

We believe that similar adjustments could be made to correct errors in the amount of service charge retained. Indeed, the Department of Revenue made just such an adjustment in September of 1975. The Department had retained only 2% service charge on the amount of taxes disbursed to the municipalities in July and August of 1975. To correct its

alleged error, in September of 1975 the Department retained not only a 2% service charge on the amounts disbursed in September but also an amount equal to 2% of the taxes disbursed in July and August. We believe that such an adjustment is also possible where the Department has retained service charges in excess of that authorized by law.

Counts II and III of plaintiffs' amended complaint alleged that the Department improperly retained service charges in excess of that permitted by law during two different time periods and requested that a "protest fund" be created from which plaintiffs could be reimbursed. Count IV requested reimbursement from those "protest funds." The relief sought by plaintiffs does not quite correspond to the relief which we deem to be available under the circumstances alleged in their amended complaint, but upon remand, further amendment can be made to the complaint to conform the prayer for relief to the relief discussed herein.

Accordingly, the order of the trial court is reversed and the case is remanded to the Circuit Court of Sangamon County with directions to reinstate plaintiffs' amended complaint and to permit plaintiffs to make further amendment as discussed herein and for further proceedings in accordance with this opinion.

Reversed and remanded with directions.

REARDON and KASSERMAN, JJ., concur.