PETER NOEL HICKEY, Plaintiff-Appellant, v. ILLINOIS RACING BOARD, Defendant-Appellee.

First District (3rd Division)  No. 1—95—1619

Opinion filed March 5, 1997.

Arthur E. Engelland, of Chicago, for appellant.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Claudia E. Sainsot, Assistant Attorney General, of counsel), for appellee.

---

JUSTICE LEAVITT delivered the opinion of the court:

The plaintiff, Peter Hickey, has been a licensed race horse trainer for approximately 30 years. In 1994, post-race test results revealed that six horses for which he was responsible had been administered a bronchodilator called albuterol, the use of which violates Illinois racing law. As a result, the racing stewards suspended Hickey's license 30 days for each violation—a total of 180 days. Following a subsequent hearing, the Illinois Racing Board (the Board) increased the suspension to 360 days pursuant to its authority under section 15(d) of the Illinois Horse Racing Act of 1975 (the Act) (230 ILCS 5/15(d) (West 1994)).

Hickey filed a complaint in the circuit court seeking review of the Board's decision pursuant to the Administrative Review Law (735 ILCS 5/3—101 et seq. (West 1992)). The judge upheld the decision of the Board. Hickey contends that the Board's order is void because a majority of the Board did not approve it, as required by section 14(a) of the Act. 230 ILCS 5/14(a) (West 1994).

This case arises from the plaintiff's violation of various regulations promulgated by the Board. Under these regulations, "[n]o horse participating in a race *** shall carry in its body any foreign substance, except as provided" by the Board. 11 Ill. Adm. Code § 509.40 (1994). A foreign substance "means all substances except those which exist naturally in the untreated horse of normal physiological concentrations [and] substances, or metabolites thereof which are contained in equine feeds or feed supplements but do not contain any pharmacodynamic and/or chemotherapeutic agents." 11 Ill. Adm. Code § 509.20 (1994). Furthermore, "[a]ny person who [unlawfully] administers *** any foreign substance to any horse *** shall have his license suspended." 11 Ill. Adm. Code § 509.60(a) (1994). Albuterol is not a permitted foreign substance. See 11 Ill. Adm. Code §§ 509.90, 509.95 (1994).

In 1994, the plaintiff was training 50 horses. The six horses involved in this case raced at the Arlington International Racecourse between July 21 and August 20, 1994. These horses and the respective races they ran were:

| | |
|---|---|
| World Class Splash: | July 21, eighth race, first place. |
| Golden Gear: | July 30, fifth race, first place. |
| Little May: | August 4, eighth race, first place. |
| Bantan: | August 12, ninth race, first place. |
| Muchomiel: | August 14, tenth race, third place. |
| Classic Fit: | August 20, first race, first place. |

After the races, the state veterinarian took blood and urine samples

from each horse and sent them to the Board laboratory for routine analysis, as required by the regulations. 11 Ill. Adm. Code §§ 509.150, 509.160, 509.170 (1994). These samples tested positive for the substance albuterol.

Following an inquiry conducted at Arlington Park Racecourse, the racing stewards (see 11 Ill. Adm. Code § 509.190(a) (1994)) ruled that Hickey had violated the regulations banning the administration of foreign substances. See 11 Ill. Adm. Code §§ 509.40, 509.50, 509.60 (1994). As a penalty, the stewards suspended Hickey's license from September 10, 1994, through December 31, 1994, and made him ineligible for relicensing from January 1, 1995, through March 8, 1995. The stewards also redistributed approximately $60,000 in purses that the horses had won. Hickey appealed to the Board.

On September 27, 1994, Hickey appeared before a hearing officer designated by the Board. He advised the hearing officer that he was not contesting the redistribution of purses or the finding that he had administered a foreign substance to his horses. Rather, he was challenging the length of his suspension. He contended that, in issuing the suspension, the stewards failed to "take into account" the nature of the foreign substance, as required by section 509.60(b)(1) of the regulations. 11 Ill. Adm. Code, § 509.60(b)(1) (1994). Hickey maintained that because albuterol is not a performance-enhancing substance, the length of his suspension was inappropriate. Hickey also argued that because the Board laboratory did not inform him that any of his horses had tested positive until August 24, 1994, after all six had raced, the stewards should not have found each positive test result to constitute a separate violation. Hickey premised this claim upon his testimony that the albuterol he administered to each horse was an ingredient in a bulk additive he fed the horses.

At the hearing, Hickey testified that in February 1994 he had attended a thoroughbred horse auction in Ocala, Florida. While there, he met Dale Smallwood, who purchased some horses from Hickey. Hickey stated that he had never met Smallwood prior to this auction. Hickey knew nothing of Smallwood's background.

During the auction, Hickey and Smallwood discussed the problem of horses that bled under the stress of a race. Smallwood told him of an additive that strengthened the capillaries and veins in race horses, and Hickey asked Smallwood if he could obtain some of this product. According to Hickey, Smallwood volunteered that there was nothing foreign in the additive and that it had been used in other jurisdictions without incident. Approximately six weeks later Smallwood delivered two plastic tubs of a substance to the plaintiff's farm in Ocala, Florida. Each tub contained less than half a gallon of a white

sugary powder. The tubs were neither labeled nor contained directions for the use of their contents; however, Hickey said that Smallwood had given him verbal directions to "put a little scoop in the night feed." Hickey admitted that he supplemented the feed of the six horses at issue with this substance. He asserted that he did not know the contents of the substance when he fed it to his horses, although he personally tasted it prior to putting it in the horses' feed.

Dr. Ronald Jensen, a veterinarian employed by the Board, testified that albuterol is a bronchial dilator that is not approved by the FDA for use in horses. Jensen stated that a Board rule precludes the use of any medication in horses unless there is prior FDA approval or prior approval of the state veterinarian. Jensen could not conclusively state that albuterol was a performance-enhancing drug generally, but he did indicate that if a horse was a bleeder suffering bronchial constriction, a bronchial dilator such as albuterol would improve a horse's ability to race.

Vincent Brencick, a veterinarian, testified on behalf of Hickey. He opined that albuterol could be used as part of a therapeutic regimen for treating horses that suffer from bleeding following a race. Brencick does not believe that albuterol enhances the performance of a normal horse, but he acknowledged that if any of the horses involved suffered from a respiratory problem, albuterol could have had a positive effect on their performances. Brencick also acknowledged that the FDA did not approve albuterol for use on horses, although he stated that racing officials in Texas, Arkansas, and Louisiana permit albuterol to be administered to race horses in their states.

Shelly Kalita, the director of the Board laboratory, explained the general procedures employed by the laboratory before it confirms that a horse's blood or urine contains a foreign substance. The lab's screening process normally took 5 to 10 days to confirm the presence of most foreign substances. In this case, however, the lab's normal procedures were not adequate to positively identify albuterol. The lab received and began routine testing on a urine sample from World Class Splash on July 22, 1994, a day after it raced at Arlington. Due to the nature of albuterol, the lab had difficulty confirming its presence in the specimens taken from Hickey's horses. The lab's ordinary tests revealed only "an indication" of albuterol, and Kalita believed further testing was necessary before she could report a confirmed positive result. Kalita believed that, prior to this case, the last time albuterol had been confirmed by the laboratory was sometime in 1991.

As a result of the difficulties the laboratory experienced in identifying the drug, it began to develop new procedures and

techniques to resolve the problem. Nonetheless, 33 days elapsed before the lab was able to confirm that the sample from World Class Splash contained albuterol. As the laboratory worked on developing these new techniques and procedures for extracting albuterol, the five remaining horses involved raced. Urine and blood samples from each arrived at the laboratory and rendered the same result as that of World Class Splash: each sample contained albuterol.

As early as July 29, 1994, however, before the second of the six horses raced, the laboratory had an initial confirmation that albuterol was present in samples taken from Hickey's horses. When questioned as to why Hickey was not notified at that time that his horses were showing an initial positive for a foreign substance, Kalita explained that she tests the samples she receives without any identification of the trainer. She stated, however, that she did call the executive director of the Board to report that she had conducted three tests resulting in an indication of albuterol and that the laboratory chemists would conduct further tests before she would confirm the results. As a result of the new procedures and techniques developed in the testing of the sample from World Class Splash, the lab needed only 11 days to determine a positive on the sixth of the samples. Today, Kalita estimates the laboratory can detect albuterol within 5 to 10 days of the receipt of a sample.

On October 18, 1994, pursuant to section 14(a) of the Act, the Board considered and decided Hickey's appeal of the stewards' ruling. Six of the nine Board members were present for this meeting. The Board's order indicates that its consideration "was limited only to the duration of the penalty imposed upon Hickey." Four of the Board members voted to increase, from six months to one year, the penalty imposed by the stewards. Two members dissented.

Hickey asserts that section 14(a) of the Act requires that a majority—five members—of the entire nine-member Board concur in an order revoking or suspending a license. Section 14(a) provides in pertinent part:

"A majority of the members of the Board shall constitute a quorum for the transaction of any business, for the performance of any duty, or for the exercise. of any power which this Act requires the Board members to transact, perform or exercise en banc, except that upon order of the Board one of the Board members may conduct the hearing provided in Section 16. The Board member conducting such hearing shall have all powers and rights granted to the Board in this Act. The record made at the hearing shall be reviewed by the Board, or a majority thereof, and the finding and decision of the majority of the Board shall consti-

tute the order of the Board in such case." 230 ILCS 5/14(a) (West 1994).

According to the Board, section 14(a) is silent as to the number of votes required to ratify Board action in a section 16 matter. Thus, the Board contends that, under Illinois law, the vote of a majority of a quorum validates the Board's action. See *People ex rel. Compton v. Penn*, 33 Ill. App. 3d 372, 375-77, 342 N.E.2d 280 (1975) (stating common law rule that, absent contrary statutory language, board action need only be approved by the vote of a majority of a quorum). However, the plaintiff contends that section 14(a) is not silent as to the voting requirements in matters of license suspension or revocation. We agree.

The final sentences of section 14(a) codify an exception to the common law quorum rule by permitting one Board member to conduct a section 16 hearing and providing specific voting requirements for review of such hearings. Thus, the rule in *Compton* cannot apply to section 16 hearings as provided for in section 14(a), and the number of votes required in a section 16 hearing depends on the legislature's intent in drafting those sentences. Section 16 governs the revocation or suspension of occupational licenses. 230 ILCS 5/16 (West 1994). The hearing on Hickey's appeal was a section 16 hearing conducted by one person, as provided for by section 14(a).

All of the language in section 14(a) following the provision for section 16 hearings relates directly to the conduct and review of those hearings. Specifically, the Board member conducting "*such hearing* shall have all powers and rights granted to the Board." (Emphasis added.) 230 ILCS 5/14(a) (West 1994). Furthermore, the record at that hearing must be reviewed by the full board or "a majority thereof," that is, by a quorum. This language is not in dispute, and, indeed, a majority of the Board reviewed the record of Hickey's section 16 hearing. Rather, it is the last clause of the final sentence that is at issue in this appeal: "The record *** shall be reviewed by the Board, or a majority thereof, *and the finding and decision of the majority of the Board shall constitute the order of the Board in such case*." (Emphasis added.) 230 ILCS 5/14(a) (West 1994).

The Board contends that this clause does not alter the number of votes generally required for it to act. According to the Board, we should interpret the final clause of the last sentence of section 14(a) as stating that "the findings and decision of the [quorum] shall constitute the order of the Board." 230 ILCS 5/14(a) (West 1994). That is, to revoke the plaintiff's license, only four of six possible votes were necessary. The Board's reasoning requires us to conclude that the word "majority," when used for both the first time in the statute and

in the last sentence, means more than half of the full Board, but when "majority" is used the second time in the last sentence, it means "quorum." However, where a word has been used more than once in a statute, "it is presumed to have been used with the same meaning throughout, unless a contrary legislative intent is clearly expressed." *City of Springfield v. Allphin,* 50 Ill. App. 3d 44, 47, 365 N.E.2d 249 (1977). In this case, that rule leads us to conclude that "majority of the Board," as used in the last sentence of section 14(a), is not equivalent to "quorum," as urged by the Board.

Our conclusion is bolstered by the fact that the word "Board" is also used twice in the last sentence. The first reference is clearly to the full Board. Absent legislative intent to the contrary, the second use of "Board" must also refer to the entire nine-member Board. Therefore, a "majority of the Board" as used in the last section of section 14(a) means five members of the full Board. Furthermore, if we interpret the clause as requiring only a majority of a quorum, the clause becomes superfluous, as section 14(a) earlier authorizes the Board to act upon the majority of a quorum. A statute should be interpreted so as to not render its terms superfluous. *Jones v. Municipal Officers Electoral Board,* 112 Ill. App. 3d 926, 446 N.E.2d 256 (1983).

Although the language employed in section 14(a) is somewhat ambiguous, "[w]here the language of a statute admits of two constructions, one of which would make the enactment absurd and illogical, while the other renders it reasonable and sensible, the construction which leads to an absurd result must be avoided." *Fisher v. Brombolich,* 207 Ill. App. 3d 1053, 1060, 566 N.E.2d 785 (1991). For the term "Board" to have a reasonable meaning in the last sentence of section 14(a), it must refer to the entire nine-member Board.

We believe this is so because the Board's interpretation of section 14(a) leads to the anomalous result that the number of votes necessary to deprive a person of his racing license, the granting of which confers a property right in the holder (*Balmoral Racing Club, Inc. v. Illinois Racing Board,* 151 Ill. 2d 367, 603 N.E.2d 489 (1992)), depends on how many Board members are present to review the record of a suspension hearing. According to the Board's reasoning, some licensees may be deprived of their property rights upon a vote of only three members of the Board—if five members are present—while others may keep their license on the same three votes—if six or more members are present. We do not believe the legislature intended to so arbitrarily treat the property interests of individual licensees. Indeed, as this court has recognized, these licenses "frequently represent the only livelihood of their holders." *Kurtzworth v. Illinois Racing Board,* 92 Ill. App. 3d 564, 589, 415 N.E.2d 1290 (1981).

Rather, we believe the legislature intended to afford uniform treatment to individuals whose occupational licenses are at stake. It did so by requiring that a majority of the Board "shall" determine revocation or suspension of licenses. This means that the Board, even though authorized to act with only a quorum present, must achieve five votes to effect an order under section 16.

Our decision is also consonant with the legislature's intent when it enacted the language at issue. The legislature originally added this language by a 1957 amendment to section 37a6 of the predecessor to the Act. See Ill. Rev. Stat. 1957, ch. 8, par. 37a6. Before 1957, the Board was authorized to perform any action, without exception, upon a meeting of a quorum. See Ill. Rev. Stat. 1955, ch. 8, par. 37a6. Significantly, at the time the legislature added the language at issue in this case, the Board consisted of only three members. Ill. Rev. Stat. 1957, ch. 8, par. 37a1. Thus, at the time, the Board's decision in review of a hearing could only be valid if it achieved the vote of a majority of the full Board—that is, two of three Board members. Although the legislature has increased the size of the Board twice since 1957 (see Ill. Rev. Stat. 1965, ch. 8, par. 37a1 (seven-member Board); Ill. Rev. Stat. 1987, ch. 8, par. 37—4 (nine-member Board)), it has never amended the language requiring that "the *** decision of the majority of the Board shall constitute the order of the Board" in matters of license suspension and revocation. 230 ILCS 5/14(a) (West 1994).

Because the provision of section 14(a) at issue affects the rights or benefits of an individual, it is mandatory upon the Board. *Stull v. Department of Children & Family Services*, 239 Ill. App. 3d 325, 333, 606 N.E.2d 786 (1992). Under the circumstances, when the quorum cannot achieve a majority vote on a section 16 matter, it must "seek the input of *** absent member[s]." *Melrose Park National Bank v. Zoning Board of Appeals*, 79 Ill. App. 3d 56, 62, 398 N.E.2d 252 (1979).

Our decision leaves us to determine the effect of an order by the Board that lacks the required five votes. The Board is authorized by section 14(a) to act, as it did here, when a mere quorum is present. Section 14(a) also directs that "the findings and decision of the majority of the Board shall constitute the *order* of the Board." (Emphasis added.) 230 ILCS 5/14(a) (West 1994). Having concluded the Board's order does not carry by the required majority vote, the order is null and we must vacate it.

Due to our resolution of this issue, we need not address the remaining issues raised by the plaintiff. For all of the foregoing

reasons, the judgment of the circuit court is reversed and the order of the Board is vacated.

Circuit court reversed; order of the Board vacated.

McNAMARA and RAKOWSKI, JJ., concur.